

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,092

**HECTOR ACOSTA, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 1513043D
### IN THE 396TH JUDICIAL DISTRICT COURT
### TARRANT COUNTY

*Per curiam*. KELLER, P.J., filed a concurring opinion. YEARY and KEEL, JJ., concurred.

## O P I N I O N

In November 2019, a jury convicted Appellant, Hector Acosta, of capital murder for fatally shooting Erick Zelaya and Iris Chirinos in the same criminal transaction. *See* TEX. PENAL CODE ANN. § 19.03(a)(7)(A). Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial court sentenced Appellant to death. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071,

Sec. 2(g).[1]  Direct appeal to this Court is automatic. Art. 37.071, Sec. 2(h).

Appellant raises seventeen points of error.  In five points of error (one, two, three, thirteen, and fourteen), he challenges the trial court's denial of his motions to suppress.  In one point of error (four), he asserts error in the jury charge.  In three points of error (five, six, and seven), he contends that the State improperly elicited, and improperly referenced in jury argument, evidence of his nationality.  In four points of error (eight, nine, fifteen, and sixteen), Appellant complains of improper prosecutorial jury argument.  In three points of error (ten, eleven, and twelve), he challenges the trial court's denial of his motion for continuance.  In his last point of error (seventeen), Appellant asserts error in the admission of evidence.

After reviewing Appellant's seventeen points of error, we affirm the trial court's judgment of conviction and sentence of death.

**Background**

Appellant, known by the street name "Cholo," was living at a residence on Truman Street in Arlington, Texas.  One night, the residence was subject to a drive-by shooting. Appellant was not injured, but a friend who also lived at the residence was shot three times and nearly died.  Appellant later discovered that another friend of his, Erick Zelaya, known by the street name "Diablo," had been involved in the drive-by shooting.  Months after the drive-by shooting, Appellant moved to a new residence on Burton Drive which was in the

_____
[1] Unless otherwise indicated, all subsequent citations in this opinion to "Articles" refer to the Texas Code of Criminal Procedure.

same neighborhood as the Truman Street residence. Also staying at the Burton Drive residence were Zelaya and his seventeen-year-old girlfriend, Iris Chirinos.

On September 2, 2017, law enforcement responded to a call from a local resident who found a severed head in a wooded area near Appellant's previous residence on Truman Street. The head was on a dirt path behind an apartment complex and beside the head was a homemade sign that read, in Spanish, "La Raza Se Restreta y Faltan 4," which translates to "respect the race and there are four more." A black plastic bag, which appeared to have been burned, was located near the head. Grant Gildon, a homicide detective with the Arlington Police Department, reported to the scene as police canvassed the immediate area attempting to identify the severed head. An officer informed Gildon that Mariano Sanchez-Pina, who had been arrested on an unrelated burglary charge, might have information about the severed head. Gildon, along with Detective Michael Barakat, met with Sanchez-Pina several times at the police station.[2] Sanchez-Pina identified the severed head as belonging to "Diablo" and provided information about where the rest of his body could be found. Sanchez-Pina also said that Appellant, whom he knew by the name "Cholo," was involved in Zelaya's murder. The detectives met with two other witnesses who provided information connecting Appellant and Sanchez-Pina to Zelaya's murder and dismemberment. Additionally, police received two anonymous Crime Stoppers tips connecting Appellant to the murder.

_____

[2] Barakat was assigned to the gang unit. He was asked to assist in the investigation because officers initially responding to the severed head saw a tattoo on the lip that led them to believe that the decapitation could be gang related.

Based on the information received from these informants, Gildon obtained and executed a search warrant for Appellant's Burton Drive residence. Inside the residence, police discovered blood splatters, droplets of blood, and smeared bloodstains throughout the house. In a bedroom, police discovered a machete and bloodstains that had soaked through the floor. Police also found trash bags in the living room that contained several .22-caliber casings, human teeth, some human hair, a blood-stained shirt, a blood-stained towel, and a cement block with blood on it. In the backyard, police discovered multiple items that appeared to have blood on them as well as a sword sheath and shell casings. Police also found an area of disturbed dirt with a pickaxe, a spade, and a shovel nearby. Underneath the dirt, a rug covering a hole was discovered and, as more dirt was removed, a human foot was exposed. At that point, Gildon obtained an arrest warrant for Appellant.[3] Eventually, the excavation revealed two bodies that were later identified as being Zelaya and Chirinos.

Autopsies of Zelaya and Chirinos revealed that both suffered multiple fatal gunshot wounds along with other injuries. Zelaya had a total of six gunshot wounds—three to the head, two the torso, and one to the back—and nineteen stab wounds, which included wounds related to the decapitation, chopping-type wounds down the side of his head, multiple stab wounds on his upper back and the back of his neck, and cutting wounds on his extremities. Chirinos's injuries included a gunshot wound to the chest, which may not

_____

[3] When Gildon obtained the arrest warrant for Appellant, the police had not yet discovered both bodies, so the arrest was for the charge of murder. The charge was later changed to capital murder based on the discovery of the second body.

have immediately been fatal, two gunshot wounds to the head, and blunt force trauma to the head. Both deaths were deemed to be homicide.

Appellant was arrested on September 7, 2017. Gildon and Barakat interviewed Appellant at the police station a few hours after his arrest. During the interview, Appellant confirmed that his nickname was "Cholo" and upon being questioned about his history with Zelaya and Chirinos, Appellant confessed to murdering them: "If you want to know the truth, uh, I did kill him, I killed him." He then described how he murdered Zelaya and Chirinos.

Appellant described the gun he used in the offense and admitted to shooting both Zelaya and Chirinos before decapitating Zelaya with a machete. He told the detectives that after the murders he sold the gun to a man that he did not know. He stated that he placed Zelaya's head near the Truman Street residence to send a message to the other people he believed to be involved in the drive-by shooting. To emphasize his message, Appellant placed a sign next to Zelaya's decapitated head that translated to, "the race is to be respected and there are four more." Appellant said he showed the bodies to several people who knew he wanted revenge for the Truman Street shooting and afterwards, he buried the bodies in his backyard. He told the detectives that his friend, Mariano Sanchez, helped him move and bury the bodies and that another friend cleaned the house while he dug the hole in the backyard. Throughout the interview, Appellant maintained that he alone committed the murders.

Appellant was indicted for capital murder for the deaths of Zelaya and Chirinos. At trial, the State called fourteen witnesses who presented evidence of: the discovery of

Zelaya's severed head; the ensuing police investigation, including Appellant's interview and the recovery of the murder weapon; the DNA report concerning evidence collected from the scene[4]; ballistics testing of bullets and cartridges found at the scene; and the autopsies of Zelaya and Chirinos. The defense called two witnesses: an employee of the Mexican Consulate, who testified about the Consulate's contact with Appellant after his arrest; and a longtime criminal defense attorney, who testified about the warnings the detectives gave to Appellant before his interview. Appellant did not testify. The jury found Appellant guilty of capital murder as charged in the indictment.

During the punishment hearing, the State called fifteen witnesses who presented evidence of: a murder alleged to have been committed by Appellant two months prior; Appellant's affiliation with Mexican gangs and cartels; his plans to engage in the drug trade if he were sentenced to life in prison; and images and posts from the Facebook page of "Xholo Monterrey," which the State theorized belonged to Appellant, who is originally from Monterrey, Mexico. The defense called twelve witnesses: seven family members, including Appellant's younger brother and sister; a cosmetologist who worked with Appellant's mother before her death; a retired prison employee who testified about prison security and inmate classification; and three medical expert witnesses. After deliberating, the jury affirmatively answered the future dangerousness special issue and negatively answered the mitigation special issue. *See* Art. 37.071, §§ 2(b), (e). Accordingly, the trial

_____

[4] DNA analysis established that Zelaya's and Chirinos's DNA profiles matched blood samples obtained from inside Appellant's Burton Drive residence. A machete was found inside the residence and a DNA analysis of its blade matched Zelaya's DNA profile.

court sentenced Appellant to death. *See* Art. 37.071, Sec. 2(g). This appeal followed.

## Denial of Motion for Continuance

In three points of error, Appellant contends that the trial court erred in denying his motion for continuance. Specifically, he asserts that because the continuance was denied, his trial counsel was unable to properly investigate and prepare for trial. Therefore, Appellant argues, the denial of the continuance violated his right to due process under the Fourteenth Amendment (point of error ten), the Eighth Amendment's requirement of individualized sentencing (point of error eleven), and his right to effective assistance of counsel guaranteed by the Sixth Amendment (point of error twelve).

## Background

The State filed its complaint against Appellant on September 14, 2017. Appellant's trial counsel was appointed to the case on September 20, 2017, with an additional attorney appointed to the case the following day. Appellant was indicted for capital murder on September 29, 2017. The trial court filed its scheduling order on November 29, 2018, which had jury selection set for August 29, 2019, and a trial on the merits set to begin on October 28, 2019. On July 15, 2019, Appellant filed a written pre-trial motion for continuance asserting that due to newly and recently discovered matters, trial counsel needed additional time to investigate. Appellant articulated three reasons for seeking a continuance:

(1) Trial counsel could not complete their mitigation investigation under the current trial schedule because: (a) the trial team was unable to travel to Mexico to interview witnesses who might have corroborating mitigation information, and (b) the trial team needed additional time to investigate Appellant's extraneous offenses, which the State had

not yet disclosed at the time the motion was filed.

(2)     Trial counsel needed more time to review "voluminous disclosures by the State"—specifically, a hard drive containing approximately 130 hours of video footage that had been provided to the defense six months earlier.

(3)     Trial counsel could not "investigate, draft, and litigate critical pre-trial motions" under the current trial schedule.

On August 6, 2019, the trial court held a hearing on the continuance motion. Appellant's counsel stated that they were behind on their mitigation investigation and had recently discovered some information regarding Appellant's mental health that they'd like to further investigate. Counsel asked for at least three additional months, but perhaps up to six, to prepare for trial. The evidence presented at the hearing addressed the trial team's inability to travel to Monterrey to further their mitigation investigation in person due to the dangerous conditions presented in Mexico. Appellant had two mitigation specialists investigating his case and both testified at the continuance hearing.

Vince Gonzales, the initial mitigation specialist appointed on Appellant's case, had been on the case for over two years when he testified at the hearing. He said that he had interviewed about twenty witnesses, including Appellant's sister, aunts, uncles, employers, and wife. When asked how much more mitigation work remained, Gonzales indicated that he thought that most interviews had been completed but that due to recent developments they needed to conduct more interviews in Mexico. Gonzales did not describe what the recent developments were, but explained that after consulting with their experts, the trial team needed to glean information from existing reports, records, and interviews to supplement what the experts needed. He said that with a three-to-six-month continuance,

the trial team would be in a better position to present mitigation evidence. Gonzales further testified that the situation in Monterrey was very dangerous. However, he acknowledged that the situation had been dangerous since the date of his appointment to Appellant's case. Gonzales conceded that, given the ongoing dangerous situation, the trial team would not be able to conduct any in-person interviews in Mexico, even with a six-month continuance.

Stephen Escriche, Appellant's second mitigation specialist, was brought onto the case because he spoke Spanish. Since joining the trial team, Escriche had interviewed twelve to fifteen people who only spoke Spanish, but still had quite a few witnesses located in Mexico that he needed to speak to. In a mitigation investigation, Escriche explained, it is imperative to see where the defendant has lived, take photographs of that location, and speak to as many family members and witnesses as possible. He further explained that it is particularly important that mitigation interviews with Spanish-speaking witnesses be conducted without interpreters because translation disrupts the communication. Escriche testified that he would be unable to conduct a constitutionally adequate mitigation plan without traveling to Monterrey to obtain Appellant's school records, medical records, birth records, and employment records, as well as speak in-person with Appellant's friends and family, and his former teachers and employers. He explained, however, that Monterrey is a dangerous area due to the presence of drug cartels, and that the U.S. State Department had issued a warning to prevent citizens from traveling to the area.

On cross-examination, Escriche acknowledged that the situation in Mexico had been dangerous for the entire time Appellant's case had been pending and thus, he never had the ability to travel to Mexico to investigate. He also testified that he did not foresee the

situation changing anytime soon and, in fact, opined that it might get worse due to the recent conviction of cartel head Chapo Guzman. Escriche conceded that no period of continuance would afford him the ability to travel to Mexico to do a mitigation investigation. He also acknowledged that future interviews with witnesses in Mexico would have to be via telephone, which would take three to six months to accomplish.

At end of the hearing, the trial court took the matter under advisement, stating that it was going to stick with the proposed trial date for the time being. The judge advised Appellant that if something were to change between the date of this hearing and the date of trial, that he should bring it to the attention of the court. The next day, at a hearing on pretrial motions, Appellant renewed his motion for continuance in light of the trial court's denial of his motions to suppress. The trial judge indicated that he still had the motion under advisement. At the final pretrial hearing, the trial judge signed an order denying Appellant's motion for continuance. Appellant's counsel acknowledged the trial court's order and asserted that that they were proceeding under duress. His counsel sought a running objection to the denial of the continuance which the trial court granted.

Before individual voir dire began, Appellant renewed his motion for continuance. Appellant's counsel informed the trial court that the defense team had two witnesses in Mexico that they were having trouble locating and needed more time to find them. The trial court denied the motion. At the end of individual voir dire, Appellant again renewed his motion for continuance. Appellant's counsel told the court that the trial team had interviewed an additional fifteen to twenty individuals in Mexico, but none of them were willing or able to come testify at trial. He requested more time to find more witnesses.

The trial court denied Appellant's request. Before the start of the guilt-phase, Appellant again renewed his motion for continuance but provided no additional information and made no further argument. The trial court denied the motion.

## Standard of Review

The granting or denial of a motion for continuance falls within the sound discretion of the trial court. *Heiselbetz v. State*, 906 S.W.2d 500, 511–12 (Tex. Crim. App. 1995); *see* Art. 29.03 (providing that criminal action may be continued upon sufficient cause shown in motion); Art. 29.06(6) (explaining that sufficiency of motion for continuance shall be addressed to "sound discretion" of court and "shall not be granted as a matter of right"). Thus, we review a trial court's ruling on a motion for continuance for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764–65 (Tex. Crim. App. 2007). To show reversible error predicated on the denial of a pretrial motion for continuance, a defendant must demonstrate both that the trial court erred in denying the motion and that the lack of a continuance caused harm. *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010).

### *Denial of Due Process*

In point of error ten, Appellant contends that the trial court's denial of a continuance violated his right to present a meaningful defense, thereby violating his right to due process. Appellant asserts that his defense team could not complete their mitigation investigation due to the safety risk imposed by traveling to Monterrey to gather evidence. Next, Appellant maintains that his counsel needed more time to review discovery materials which included more than 100 hours of video recordings from the State, as well as time to

investigate the extraneous offenses the State disclosed only a few weeks prior to the hearing. Lastly, Appellant argues that his trial counsel's heavy caseload prevented him from effectively litigating pretrial matters. We address each of his claims separately.

MITIGATION INVESTIGATION

Appellant asserts that the denial of a continuance deprived him of the opportunity to find witnesses who could corroborate the information that he self-reported about his life in Mexico. This, he maintains, left his counsel without an evidentiary basis to challenge the State's punishment case or to counter the State's attacks on the defense experts' opinions. Appellant does not allege that he was unable to present mitigating evidence; he simply laments that the source for his mitigating evidence was, to a great extent, limited to himself. However, his suggestion that witnesses in Mexico would have provided corroborative information about his childhood in Mexico is purely speculative. *See Renteria v. State*, 206 S.W.3d 689, 702 (Tex. Crim. App. 2006) (explaining that law requires more than speculation to justify appellate reversal for trial court's failure to grant continuance).

Appellant's mitigation expert, Escriche, testified at the continuance hearing that he had identified additional witnesses in Mexico that he still needed to interview. But Appellant's counsel informed the court that the additional witnesses in Mexico had been interviewed but were unwilling or unable to testify at trial. Thus, the record shows that Appellant's trial team was able to conduct the interviews for which a continuance had been sought. The purported lack of an evidentiary basis to rebut the State's punishment case or its attacks on his experts' opinions is not attributable to an inability to investigate due to

the denial of a continuance. Further, Appellant's speculation about potential corroborative evidence does not demonstrate specific prejudice to Appellant's mitigation case caused by the trial court's denial of his request for a continuance. *See Renteria*, 206 S.W.3d at 699 (explaining that defendant must show specific prejudice to his defense to establish that trial court abused discretion in refusing to grant continuance).

Appellant also contends that a continuance was needed to effectively challenge the State's punishment case against him. But he does not allege, nor does the record reflect, any specific prejudice to his defense. Appellant filed both a motion and a request for notice of extraneous offenses on May 17, 2019. The State filed its responsive notice on July 19, 2019, which gave notice of the extraneous offenses it intended to introduce.[5] Appellant concedes the existing record does not establish what, if any, additional information regarding the extraneous offenses that counsel would have discovered. Appellant does not assert, nor does the record demonstrate, that he was unfairly surprised at trial or unable to effectively cross-examine any of the State's extraneous offense evidence. While one of the extraneous offenses was an alleged murder that involved testimony from multiple

_____

[5] The State's disclosure notice included the following extraneous offense evidence: capital murder alleged to have been committed by Appellant in Tarrant County on July 3, 2017; misdemeanor possession of marijuana alleged to have been committed by Appellant on July 20, 2017; cartel and gang affiliations as disclosed by Appellant in his interview with detectives in this case; numerous tattoos on Appellant's body indicative of cartel and gang affiliation; Appellant overstaying his 2010 tourist visa and remaining in the U.S. illegally; various images and posts from Appellant's Facebook account that detail his cartel and gang affiliations; and Appellant's 2010 conviction for possession of a firearm from Monterrey, Mexico. The State filed a supplemental disclosure on October 15, 2019, which included information from a jail informant who testified at the punishment hearing that he was approached by Appellant about dealing drugs while they were both incarcerated.

witnesses, it was not a factually complex murder, and the record reflects that defense counsel was able to effectively cross-examine these witnesses. Appellant has failed to show how his trial counsel could have been more effective if given more time to prepare for the extraneous offense witnesses. *See Gallo*, 239 S.W.3d at 764–65 (concluding that defendant failed to show that he was actually prejudiced by trial court's denial of continuance given trial counsel's cross-examination of witness).

DISCOVERY REVIEW

Appellant alleges generally that the denial of a continuance denied him due process because he was unable to properly review all the discovery evidence. Appellant claimed in his motion for continuance that the trial team needed more time to review an external hard drive containing approximately 130 hours of video footage. The record reflects that the State provided the hard drive containing the footage to the defense in late January 2019. Six days later, Appellant filed a motion asking the trial court to require the State to identify the portions of the video that are relevant, exculpatory, or mitigating. In February 2019, the record reflects that the court and the parties had informal off-the-record discussions about the State identifying the relevant portions of the video for the defense, and the court set a tentative June deadline for the State's disclosure.

At the pretrial hearing on August 7, 2019, the State advised that their review of the video footage revealed that roughly ninety-seven percent of the video had nothing to do with the case and that any relevant portions would be identified for the defense. No further mention of the review of the video footage or the identification of relevant portions of the footage appear in the record. This suggests that the State provided the necessary

information to Appellant within the agreed upon timeframe, and that Appellant abandoned this basis for seeking a continuance. Moreover, Appellant does not claim, nor does the record reflect, that he was unfairly surprised at trial by the State's use of any video footage. Appellant does not otherwise specify what discovery he was unable to review or how he was prejudiced by the denial of a continuance regarding discovery.

### PRETRIAL LITIGATION

As for the purported need for additional time to investigate, draft, and litigate critical pre-trial motions, the record reflects that Appellant filed approximately seventy pretrial motions, including motions to suppress evidence, motions in limine, discovery motions, and motions challenging the constitutionality of the death penalty statutory scheme. In his motion for continuance and at a subsequent hearing on that motion, Appellant did not articulate any specific pretrial issues or motions that required further investigating, drafting, or litigating. Nor does the record reflect any specific pretrial matters that were not pursued or unable to be pursued due to the lack of a continuance.

In conclusion, the record does not show that Appellant's trial team was unable to complete their mitigation investigation, review discovery materials, or litigate pretrial matters. Nor does the record show that Appellant's defense was prejudiced by their purported inability to do so. *See Renteria*, 206 S.W.3d at 699. Appellant has not established that the trial court's denial of a continuance denied him due process. Therefore, we conclude that the trial court did not abuse its discretion in denying his motion for continuance. We overrule point of error ten.

### *Deprivation of Individualized Sentencing*

In point of error eleven, Appellant argues that the trial court's denial of his motion for continuance violated the Eighth Amendment. More specifically, he claims that the denial deprived him of sufficiently individualized consideration at sentencing. Appellant maintains that he was deprived of a reliable jury determination on whether he deserved a lesser sentence than death because he lacked access to potentially mitigating evidence from his formative years in Mexico. He reiterates that the denial of a continuance impaired his ability to challenge the State's punishment case and left his expert witnesses vulnerable to attack because their opinions relied on Appellant's self-reporting. However, as with his due process claim, any lack of information that could provide the whole picture of Appellant's life was not attributable to the denial of a continuance.

The record reflects that Appellant did in fact have access to witnesses who potentially had mitigating information about him, including additional interviews with Spanish-speaking witnesses from Mexico. This access, however, simply did not yield witness testimony that his counsel could present at trial. Nevertheless, Appellant's counsel put forth a well-developed mitigation defense. Through family and friends, counsel presented evidence of Appellant's life growing up in Mexico. The evidence reflected that Appellant's parents provided a good life for Appellant and his three siblings even though they lived in a dangerous place. In 2008, after Appellant's father lost his job, the family moved to Arlington, Texas, with Appellant joining them in 2010. In 2014, Appellant's father fatally shot Appellant's mother and then took his own life. Appellant presented evidence that, after the murder-suicide, the local community organized fundraisers to help his family, but his girlfriend, with whom he has three children, collected the money and

left town with their children. Shortly thereafter, Appellant began using methamphetamine and cocaine daily.

Appellant also presented testimony from three experts concerning his brain functioning. Dr. Antonio Puente, a clinical psychologist, conducted psychological testing on Appellant and concluded that he suffered from executive brain dysfunction. Puente explained that Appellant's brain does not work as it should due to:

- multiple traumatic brain injuries:

  Appellant and his sister reported that Appellant sustained multiple head injuries: at age 5, he fell and hit the front of his head on concrete stairs; at age 7, he was hit by a rock above his left eye; at age 10, he was hit by a car while riding his bike and lost consciousness; as a teenager, he was hit on the head with a baseball bat and lost consciousness and was a passenger in a car that flipped eight times; and at age 27, he was hit in the back of the head by a falling brick;

- multiple traumatic experiences:

  Puente cited the tragic death of Appellant's parents, Appellant's girlfriend leaving him while pregnant by another man, his chaotic lifestyle with drugs and "people shooting at his house," and childhood violence that Appellant suffered at the hands of his father, who Appellant alleged used "harsh disciplinary techniques" and frequently whipped him; and

- poly-substance abuse:

  Appellant disclosed to Puente that he started using marijuana at age 14, using cocaine and ecstasy at age 17, and using large amounts of other drugs, methamphetamine and cocaine in particular, around age 25.

Puente opined that Appellant has slow response times, poor emotional control, and an impaired ability to understand, adapt, and respond to his environment. Puente stated that he had been unable to access any medical records from the hospital in Mexico where Appellant had been previously treated and thus, had to rely on Appellant's self-reporting

to perform his assessment. He concluded that Appellant's intellectual abilities ranged from upper borderline to low normal levels, though he did not administer an IQ test.

Dr. Jeffery Lewine, a neuroscientist, testified that Appellant's MRI showed signs of structural abnormalities in Appellant's brain—areas in his frontal lobes are smaller than normal—which resulted in difficulties with decision making and problem solving. Lewine also testified that Appellant's EEG showed abnormalities in the fiber tracts interconnecting brain regions that compromised Appellant's language functions, emotional function, memory, and attention. Ultimately, Lewine expressed that the MRI and EEG results showed that "the frontal lobes of [Appellant's] brain are not functioning properly[,] and the different parts of the brain are not talking to each other the way that they normally should be." He opined that these "significant abnormalities and dysfunction in the frontal lobes," which "related to deficient executive functioning," resulted from Appellant's "complicated life history," with traumatic brain injury being the main contributing factor. Lewine acknowledged, however, that he could not exclude substance abuse and "other stress factors" as contributing factors. Because he could not access Appellant's medical records, he also relied on Appellant's self-reporting in conducting his evaluation.

Dr. Rahn Minagwa, a clinical and forensic psychologist with expertise in childhood trauma, conducted a psychosocial assessment of Appellant that focused on the risk and protective factors present during Appellant's development.[6] He relied on self-reporting

_____

[6] According to Minagwa, the risk and protective factors involve five domains that interact and change over time: individual factors, family factors, school factors, peer-related factors, and community and neighborhood factors.

from Appellant, and in preparing his evaluation, Minagwa only spoke with Appellant and Appellant's sister. Minagwa explained that a "risk factor" is "a scientifically established factor for which there's strong objective evidence of a causal relationship to a problem." He testified that children who have been abused "are at greater risk to develop problems with substance abuse, school failure, [and] mental problems as they get older." Further, without "corrective measures," the risk follows children into their adult lives and impacts the ability to form relationships. Minagwa noted the cumulative effect of risk factors: "The more risks that a child or teenager faces, the greater the likelihood that they're going to have problems growing up." Minagwa explained that "protective factors" are "those factors that decrease the likelihood of engaging in risky behavior for children."

Minagwa concluded that Appellant had nineteen out of twenty-eight risk factors (eight of which were not by choice) and three out of fifteen protective factors. Minagwa explained that the nineteen risk factors were predictive of Appellant having problems growing up and in adult life; the protective factors "weren't sufficient" to counter all the risk factors. Minagwa opined that without intervention, Appellant would continue to engage in criminal acts of violence; it would take significant intervention to alter this trajectory because Appellant's risk factors were not corrected in adolescence. Minagwa acknowledged that no intervention had worked on Appellant thus far.

Thus, Appellant put forth multiple mitigation witnesses during punishment. Given the significant individualized mitigation evidence presented, Appellant has not demonstrated that the trial court's denial of a continuance deprived him of individualized sentencing. Therefore, we conclude that the trial court did not abuse its discretion in

refusing to continue the trial.  We overrule point of error eleven.

### Denial of Effective Assistance of Counsel

In point of error twelve, Appellant argues that the denial of his motion for continuance rendered his trial counsel ineffective. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (holding defendant must show deficient performance by counsel and prejudice to defense to establish Sixth Amendment claim for ineffective assistance of counsel).  He reiterates his claim that his trial counsel lacked an evidentiary basis to challenge the State's punishment case or rebut the State's attacks on the defense experts' opinions.  However, the record reflects that the purported lack of evidentiary basis was not due to deficient performance on the part of trial counsel.  While Appellant's case had some language, logistical, and geographical challenges, his trial team (which included three defense attorneys, a defense investigator, and at least two mitigation specialists) had over two years to prepare for trial.  The record shows that Appellant's defense team sufficiently overcame those challenges.

We have not hesitated to declare an abuse of discretion where denial of a continuance has resulted in representation by counsel who were not prepared. *Rosales v. State*, 841 S.W.2d 368, 372 (Tex. Crim. App. 1992).  This is not such a case.  Nothing in the record reveals that Appellant's counsel's performance was constitutionally compromised.  That counsel could have presented a better or different case concerning either future dangerousness or mitigation, does not demonstrate that the case his counsel presented or that counsel's representation failed to pass constitutional muster.  Nor does it demonstrate that Appellant was harmed by his trial counsel's performance.  The record

here does not establish that the trial court's denial of a continuance deprived Appellant of effective assistance of counsel. *See Renteria*, 206 S.W.3d at 699. Thus, we conclude that the trial court did not abuse its discretion in denying the motion for continuance. We overrule point of error twelve.

**Denial of Motion to Suppress Custodial Statements**

In three points of error, Appellant contends that the trial court erred in denying his motion to suppress his custodial statements to police. He argues that his statements were taken in violation of *Miranda v. Arizona* and Art. 38.22 (point of error one), that his waiver of his *Miranda* rights was involuntary under the Fifth and Fourteenth Amendments (point of error two), and that the admission of his custodial statements violated Art. 38.21 and 38.22 because they were involuntary given the totality of the circumstances (point of error three).

**Background**

Detectives Gildon and Barakat interviewed Appellant at the police station a few hours after his arrest. At the beginning of the interview, Barakat gave Appellant his *Miranda* and Art. 38.22 warnings. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966); Art. 38.22, Sec. 2(a). He first asked Appellant in Spanish if he understood Spanish and Appellant responded in Spanish that he did. Barakat then read the warnings verbatim from a card issued by the Arlington Police Department that translated the standard warnings into

Spanish.  As translated into English, the relevant portion of their exchange was as follows[7]:

Barakat:     Ok. You have the right to maintain silens [sic], silence and to … not make a statement and any statement you make can be used against you in your evidence. Understand?

Appellant:     [Appellant nods head indicating yes]

Barakat:     Any statement can be used as evidence against you in court. Understand?

Appellant:     [Appellant nods head indicating yes]

Barakat:     You have the right to have an attorney present to advise with you during any interview. Do you understand me?

Appellant:     [Appellant nods head indicating yes]

Barakat:     If you cannot hire an attorney, you have the right to have an attorney hired to advise with you before and during the interview.[8] Understand?

Appellant:     Yes.

Barakat:     You have the right to terminate the interview at any time. Do you understand me?

Appellant:     [Appellant nods head indicating yes]

Barakat:     And now that you understand your rights. Do you still want to talk with us? About the new case?

Appellant:     Yes.

Barakat:     He says yes. He'll waive his rights himself.

_____

[7] This exchange is from an excerpt of a transcription and translation that was admitted at the suppression hearing and, in redacted form, at trial.

[8] One possible translation of this warning from Spanish into English results in the use of the word "employed" rather than "hired," but Appellant does not argue that there is a substantive difference between "employ" and "hired."

In a pretrial motion, Appellant sought to suppress the recording of his interview. Specifically, he asserted that his statements should be suppressed because the detectives: failed to comply with the Vienna Convention on Consular Relations; did not properly warn him of the *Miranda* warnings in Spanish; did not inform him that they wanted to speak with him about a capital murder; and did not obtain a valid waiver of his *Miranda* and Art. 38.22 rights. The trial court held a pretrial hearing on the motion.

At the hearing, the State presented the testimony of Manuel Murillo, a licensed court interpreter, who transcribed and translated Appellant's recorded interview with the detectives. Murillo explained that word-for-word translations from English to Spanish are not always possible; an interpreter must use a combination of Spanish words to convey the meaning of a single English word and rely on situational context for an accurate translation. After comparing his translation with Barakat's, Murillo remembered being confused on a few of Barakat's interpretations. On cross-examination, Murillo stated that Barakat's comment to Gildon that Appellant said he would waive his rights was not a literal translation of what Appellant said.[9] When asked about whether Appellant was advised of his right to consult with his consulate, Murillo said that he remembered the detectives telling Appellant that he had the right to an attorney if he could not afford one but didn't remember if they specifically addressed Appellant's right to meet with his consulate. Murillo testified, "Off the top of my head, I remember them telling [Appellant] that he had

_____

[9] Murillo also testified at trial that Appellant did say he understood his rights and was willing to speak to the detectives during the interview.

the right to any attorney, if he couldn't afford one[,] they could get him one, something in that light. But I don't remember specifically anything about a consulate."

Detective Gildon also testified at the hearing. He said that Barakat was present at Appellant's interview because he often assisted with Spanish translation during interviews and had been working on the investigation in this case. Gildon acknowledged that Barakat was not acting as a neutral certified interpreter; he was serving as both translator and detective. Gildon was present when Barakat read the warnings to Appellant in Spanish, and Barakat indicated to him when Appellant understood each of the warnings. During Gildon's testimony, the trial court admitted Appellant's signed warning form, which was written in English, from his previous arrest in July 2017. One of the warnings on the form advised a non-citizen defendant of the right to consular notification.[10] On cross-examination, Gildon was questioned about his understanding of consular notification under the Vienna Convention. Gildon said that he was aware of the consular notification requirement but that he did not advise Appellant of his right to consult with the Mexican Consulate. When interviewing Appellant, he believed it likely that Appellant was not a U.S. citizen but did not have confirmation at that time. Gildon did not know whether the arresting officers had advised Appellant of his consular right, nor did Barakat advise Appellant of that right in Gildon's presence.

_____

[10] The Arlington Police Department had three versions of the Spanish-language translations of the warnings. The photocopy admitted had all three versions. Barakat testified that he gave Appellant the middle version, which he marked with his name and badge number. This version does not contain the consular notification. The trial court admitted a copy of the Spanish-language version of the warnings.

Additionally, the State presented testimony from Francisco Campos. In July 2017, Campos had provided *Miranda* and Art. 38.22 warnings to Appellant in the presence of a magistrate during Appellant's arrest for misdemeanor possession of marijuana. Campos, who is fluent in Spanish, testified that he read the warnings to Appellant from a Spanish version of the form, including the right to consular notification but had Appellant sign the English version of the form.[11] Campos signed the English warning form as "Interpreter."

Detective Barakat also testified at the suppression hearing. Because Barakat was fluent in Spanish, he was asked to assist in the investigation and with translating during Appellant's interview. After confirming that Appellant understood Spanish, Barakat read him a Spanish translation of the required *Miranda* and Art. 38.22 warnings. Barakat expressed that the warnings he read to Appellant were not necessarily a word-for-word translation of Art. 38.22, but that his translation sufficiently explained those rights to Appellant. After each warning, Barakat asked Appellant to confirm whether he understood the warnings. Appellant indicated that he understood the warnings by nodding his head or verbally responding, "sí."

After reading the warnings, Barakat asked Appellant if he was willing to talk about the new case. He stated that Appellant did not respond immediately but appeared to be thinking about the question before giving a response. Appellant then said that he was willing to talk with the detectives. Barakat understood Appellant's verbal agreement to talk to them as a waiver of his rights and communicated that to Gildon. Based on his

_____
[11] The trial court found that it was standard protocol at the Arlington Jail for arrestees to always sign the English version of the form even if warnings were given in Spanish.

observation, Barakat believed that Appellant understood the warnings because Appellant appeared to be coherent and of normal intelligence, nor did he appear to be intoxicated or excessively tired. When asked for the basis for that belief, Barakat explained that his belief was based on the fact that Appellant paused as if considering his options before agreeing to talk with them. On cross-examination, Barakat said that during the interview he learned that Appellant was a Mexican national and that he knew of the responsibility of law enforcement to notify the consulate upon arresting a foreign national. Barakat did not notify the Mexican Consulate about Appellant's arrest because he believed this to be the responsibility of the book-in officer. Barakat did not advise Appellant of his consular rights, nor was Barakat aware that anyone else would do so.

Appellant presented the testimony of Jose Ortiz-Chavolla, a consular official at the Mexican Consulate in Dallas. Ortiz-Chavolla testified that the Mexican Consulate learned of Appellant's arrest through media reports but did not receive official notification until a week later. Upon learning of Appellant's arrest, Ortiz-Chavolla advised Appellant not to talk to anyone or sign anything without an attorney present. This conversation occurred after Appellant's interview with Detectives Gildon and Barakat. Four days after Appellant's arrest and interview, Ortiz-Chavolla met with Appellant in person and again advised him not to make any statements to law enforcement. Ortiz-Chavolla testified that had there been no delay in learning of Appellant's arrest, he would have advised Appellant not to give any statements to law enforcement without an attorney present.

Appellant also presented the expert testimony of Terri Moore, a seasoned criminal

defense attorney, who testified about the warnings given to Appellant. Moore said that while most of the warnings given to Appellant conveyed what *Miranda* and Art. 38.22 require, the right to an appointed attorney if indigent warning did not. In her opinion, the warning failed to adequately warn Appellant that he had the right to have an attorney appointed to represent him because it used the word "hired," which may convey that money would be required to have an attorney hired.[12] Because the warning did not use the words "appointed" or "free," it suggested that Appellant needed to hire a lawyer. Therefore, she opined that Appellant was not properly informed of his right to an appointed lawyer which rendered his statements involuntary.

Finally, Appellant testified about his interrogation. He said that he did not recall how long the interview lasted but that he was "fatigue[d]" because it had been "[a]round a week or something like that" since he had slept (although he also said that he could not recall how long it had been since he had slept). When asked about his education level, Appellant said that he went to high school but not college. Appellant acknowledged his prior arrest but denied that the *Miranda* warnings had ever been given to him before his September 7 interview. He said that he did not recall seeing the July 2017 warning form when he was arrested and that he did not recall being given a Spanish version of the form. He also testified that no one told him or read to him the warning about his consular rights.

Appellant testified that he did not have any money to hire an attorney on the day the

---

[12] Moore testified that she was assuming the translation provided by the State was correct.

detectives questioned him. When asked explicitly what he understood the warning "if you cannot hire an attorney, you have the right to have an attorney hired to advise you before and during the interview" to mean, Appellant said that he "didn't understand all those things very well." When asked how he thought he would get a lawyer based on that warning, Appellant said that he "never thought about it." He said that he did not understand the rights on the Spanish warning card. He further testified that he did not recall indicating after each warning that he understood. Appellant said that if the consular official had come to the jail before his interrogation and told him not to talk to the detectives, he would not have spoken with them. He also indicated that if he had understood all the rights on the warning card, he would not have talked to the police.

On cross-examination, Appellant expressed that he "just spoke up because [he] was fatigue[d] and [he] just wanted to find a way to be left alone." He confirmed that the detectives did not beat him, threaten him, or hurt him in any way, and that the officers treated him well. He conceded that he was not sick or injured. The State showed Appellant the warning forms he signed in July 2017 and September 2017. Appellant acknowledged that his signature appeared on the July 2017 warning form, but he denied that the jailor had read anything to him. He stated that he didn't understand the Spanish translation of those rights as given in July 2017 because he did not understand Campos' dialect: "his Spanish [was] not the kind that [he] could understand." In the end, Appellant contradicted his earlier testimony about the warnings, stating that he did not recall the detectives reading him his *Miranda* rights and denying that the warnings had been given to him.

At the conclusion of the suppression hearing, the trial court orally recited its findings. The trial court found that Appellant "was given the warnings as set out in 38.22, Section 2(a)," that Appellant "understood the warnings as given to him by Detective Barakat," and that Appellant "freely and voluntarily, knowingly and intelligently waived his right to remain silent and answered the officers' questions." Based on these oral findings, the trial court denied Appellant's motion to suppress his statements. The trial court later memorialized the ruling by signing a document entitled *Motion Index and Rulings*, which indicated that the motion had been "denied." Pursuant to an order from this Court, the trial court filed its written findings and conclusions with the Court.

## Standard of Review

We review a trial court's ruling on a motion to suppress for an abuse of discretion under a bifurcated standard. *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023). We afford almost total deference to the trial court's findings of historical fact and determinations of mixed questions of law and fact that turn on credibility and demeanor. *State v. Hardin*, 664 S.W.3d 867, 872 (Tex. Crim. App. 2022). However, we review *de novo* the trial court's determination of legal questions and its application of the law to facts. *Espinosa*, 666 S.W.3d at 667. We view the evidence and all reasonable inferences in the light most favorable to the trial court's ruling and uphold the ruling if the record supports it and the ruling is correct under any theory of the law applicable to the case. *Espinosa*, 666 S.W.3d at 667. We overturn the trial court's ruling only if it is arbitrary, unreasonable, or "outside the zone of reasonable disagreement." *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018).

The Fifth Amendment privilege against self-incrimination prohibits the government from compelling a criminal suspect to bear witness against himself. *Pecina v. State*, 361 S.W.3d 68, 74–75 (Tex. Crim. App. 2012); *see* U.S. CONST. amend. V. The Fifth Amendment right against self-incrimination is satisfied only when a defendant's statements are given voluntarily. *Vasquez v. State*, 411 S.W.3d 918, 919 (Tex. Crim. App. 2013); *see also* Art. 38.21. A defendant may claim that his statement was involuntary, and is therefore inadmissible, under any one of three different theories: 1) that the statement was involuntary under Art. 38.22, Sec. 6; 2) that the taking of the statement did not comply with the dictates of *Miranda* and Art. 38.22, sec. 2 and 3; or 3) that the statement was made in violation of the Due Process Clause because it was not freely made. *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008).

In *Miranda v. Arizona*, the United States Supreme Court crafted safeguards to protect the Fifth Amendment privilege against self-incrimination in the inherently coercive atmosphere of custodial interrogations. *Pecina*, 361 S.W.3d at 75; *see Miranda*, 384 U.S. at 444. Specifically, *Miranda* prescribed that, before any questioning occurs, a suspect in custody must be advised: 1) that he has the right to remain silent; 2) that anything he says can be used against him in a court of law; 3) that he has the right to the presence of an attorney; and 4) that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. *Florida v. Powell*, 559 U.S. 50, 59–60 (2010) (quoting *Miranda*, 384 U.S. at 479). The warnings set forth in Art. 38.22, which must be provided to an accused during a custodial interrogation, are essentially identical to *Miranda*, except that they also require the warning that an accused may terminate an interview at any time.

*See* Art. 38.22, §§ 2–3.  Both *Miranda* and Art. 38.22 require that the accused be properly admonished of these rights for any statements stemming from custodial interrogation to be admissible as evidence against him. *See Miranda*, 384 U.S. at 444; Art. 38.22, §§ 2–3.

A suspect may waive his *Miranda* rights if his waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444.  The State must prove by a preponderance of the evidence that any waiver was knowing, intelligent, and voluntary under *Miranda*. *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011).  The waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception" by law enforcement. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  The defendant waiving the right must have a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. at 382-83.

### Sufficiency of Warnings

In point of error one, Appellant contends that any statements made after Detective Barakat's warnings should have been suppressed because the warnings were constitutionally and statutorily deficient.  Appellant does not dispute that he was advised of most of his rights under *Miranda* with the exception of the right to appointed counsel if indigent.  Concerning the right to appointed counsel, Appellant contends that the translation of that warning was inadequate and failed to convey that he had the right to an appointed attorney if he could not afford one.  Therefore, Appellant argues, the warning failed to comply with the requirements of *Miranda*.

But the Supreme Court has repeatedly declined to dictate the particular words in

which *Miranda* must be conveyed. *See Powell*, 559 U.S. at 60 (noting that, although four required *Miranda* warnings are invariable, Supreme Court has never dictated words in which essential information must be conveyed); *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) (observing that Supreme Court has never required that *Miranda* warnings be given in exact form described in opinion); *California v. Prysock*, 453 U.S. 355, 359–60 (1981) (remarking that "*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures"). So, although law enforcement officers must advise defendants in custody of all four *Miranda* rights, they need not recite the warnings according to any specific formula. *See Ex parte Gardner*, 959 S.W.2d 189, 192 (Tex. Crim. App. 1996) (Mansfield, J., concurring) (noting that "substantial compliance—not specific wording—is all that is necessary for a given set of warnings to comply with *Miranda*"). The inquiry is simply whether the warnings "reasonably convey" to a suspect his rights as required by *Miranda*. *Powell*, 559 U.S. at 60; *see Duckworth*, 492 U.S. at 202 ("fully effective equivalent" of warnings listed in *Miranda* is sufficient); *Prysock*, 453 U.S. at 360 (*Miranda* warnings "or their equivalent" will suffice); *see also Bible v. State*, 162 S.W.3d 234, 240 (Tex. Crim. App. 2005) ("fully effective equivalent" of statutory warnings outlined in Art. 38.22 will suffice).

The trial court found that Appellant's testimony that Barakat did not give him warnings prior to his interrogation lacked credibility because it conflicted with video evidence of the interrogation, as well as Gildon's and Bakarat's testimony. Regarding the privilege against self-incrimination, the court found the weight of the credible evidence showed the warnings conveyed the existence of the privilege against self-incrimination,

the consequences of foregoing it, and the engagement of the adversary system. The court concluded that the substance of the warnings given by Barakat were the fully effective equivalent of the required warnings. Therefore, the court found that both of Barakat's statements regarding the consequences of waiving the privilege against self-incrimination clearly and reasonably informed Appellant that any statement could be used as evidence against him.

Regarding Appellant's right to an attorney, the court concluded that even with the translation discrepancy Barakat's warning was the fully effective equivalent of the warning required by *Miranda* and Art. 38.22. Barakat's warning sufficiently conveyed the essential message that, if indigent, Appellant had the right to have an attorney even if he could not hire one himself, and to have that attorney present. According to the trial court, the word appointed "is not talismanic" and the lack of the use of the word "appointed" did not render the warnings insufficient. Finally, the trial court concluded that Appellant's responses and conduct showed that he understood that he was waiving his right to appointed counsel.

We have previously addressed a warning similar to that about which Appellant complains. In *Darden v. State*, a juvenile defendant challenged the statutory warnings set forth in the Texas Family Code. 629 S.W.2d 46 (Tex. Crim. App. 1982). The defendant asserted that the warnings provided were not sufficient to satisfy *Miranda* or Art. 38.22 because the defendant was not informed that if he was unable to employ counsel, one would be appointed to him. Specifically, the right to counsel warnings read as follows: "[y]ou have the right to have an attorney present to advise you either prior to any questioning or during the questioning" and "[i]f you are unable to employ an attorney, you have the right

to have an attorney to counsel with you prior to or during any interviews with peace officers or attorneys representing the State." *Darden* at 49. We held that the warning given to the defendant informed him that if he was unable to employ counsel, he had the right to have an attorney. *Darden*, 629 S.W.2d at 51. Thus, we held that the wording of the warning, although in a slightly different language, was sufficient to satisfy both *Miranda* and Art. 38.22. *Id.*

Like the warning in *Darden*, the warning given to Appellant advised him that he had the right to an attorney even if he was unable to afford one, and that he had the right to have an attorney present before and during questioning. We reject Appellant's contention that Barakat's use of the phrase "to have an attorney hired" rather than an exact translation of the word "appointed" failed to inform Appellant of his right to appointed counsel if indigent. Even with the translation discrepancy, Appellant was adequately informed of his right to have a lawyer present before and during the interrogation, and of his right to have a lawyer provided for him if he could not afford one. When viewed in the context in which it was given, the warning was the fully effective equivalent of the constitutional and statutory warning.[13] Thus, the fundamental aspects of *Miranda* and Art. 38.22 were honored.

Word-for-word translations into other languages are not always possible. Here, the trial court determined that the translation variance at issue did not render the *Miranda* and

---

[13] Tex. Code Crim. Proc. Ann. art. 38.22, Sec. 3(e)(2) (requiring the statutory warnings or their "fully effective equivalent" as a prerequisite to the admissibility of video recorded statements).

Art. 38.22 warnings ineffective, and the evidence and law support the trial court's findings and conclusions. Detective Barakat "reasonably conveyed" to Appellant his rights as required under *Miranda* and Art. 38.22. *See Powell*, 559 U.S. at 60. Thus, the trial court did not abuse its discretion in denying Appellant's motion to suppress his oral custodial statements to the detectives. We overrule point of error one.

### Validity of Waiver

In point of error two, Appellant contests the validity of his waiver, asserting that his statements to the detectives should have been suppressed because he did not voluntarily, knowingly, and intelligently waive his Fifth Amendment rights. The record reflects, that after each warning, Detective Barakat asked Appellant if he understood, and Appellant answered affirmatively by nodding his head or saying, "Sí." After completing the warnings, Barakat asked Appellant, "And now that you understand your rights. Do you still want to talk with us? About the new case?" Appellant responded, "Si." Barakat then told Gildon, "He says yes. He'll waive his rights himself."

Initially, Appellant suggests, as he did in his motion to suppress, that his waiver was not valid because he did not expressly state to Barakat that he waived his rights. Appellant notes that Barakat's comment to Gildon indicating that Appellant said that he would waive his rights was not a literal translation of what Appellant said. Appellant also notes that he did not sign a waiver form at that time. However, an express written or oral statement of waiver is not required. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010); *see Thompkins*, 560 U.S. at 384–85 (explaining that *Miranda* "does not impose a formalistic waiver procedure that a suspect must follow

to relinquish those rights" and "[a]n implicit waiver of the right to remain silent is sufficient to admit a suspect's statement into evidence"). The trial court found that Appellant's cooperation and willingness to talk to the detectives was more than sufficient to imply that he waived his rights. We agree.

As to the voluntariness of Appellant's waiver, "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). Before it may be said that a waiver of a *Miranda* right is involuntary, there must be some element of official intimidation, coercion, or deception. *Leza*, 351 S.W.3d at 349; *see Connelly*, 479 U.S. at 169–70; *Oursbourn*, 259 S.W.3d at 170. On the issue of voluntariness of Appellant's waiver, the trial court found that:

- Appellant "credibly testified" that he was not sick or injured, that officers "had not beaten or threatened him," and that he was not "under the influence of any substances";

- although the interrogation occurred at night and lasted several hours, Appellant "did not appear sleep deprived or tired and he never mentioned that he was";

- Appellant was offered water at the beginning and end of his interview; and

- the detectives "did not resort to deception or promises."

The record supports these findings.

Appellant does not contend, nor does the record demonstrate, that the detectives intimidated, coerced, or deceived him in any manner. Appellant does not claim that the detectives threatened or injured him during the interrogation, that they deprived him of

sleep or food, or that he was in any way fearful due to their misconduct. In fact, as the trial court noted, Appellant confirmed that the detectives did not beat him, threaten him, or hurt him in any way. No evidence indicates that Appellant was coerced, intimidated, or forced to make any statement. *See Contreras v. State*, 312 S.W.3d 566, 574 (Tex. Crim. App. 2010) ("A statement is obtained in violation of constitutional due process only if the statement is causally related to coercive government misconduct."). No evidence in the record shows, or even suggests, that Appellant's implicit waiver of his rights was constitutionally involuntary.

Appellant argues that his waiver was not knowing and intelligent because: he was not adequately informed of his rights; he was ignorant of the U.S. legal system; he was not informed of the subject of the interview or the charges against him; and he was not advised of his right to consular notification. A waiver is knowing and intelligent if the accused has been made aware, and fully comprehends, that he has the right to remain silent in the face of the police interrogation and to discontinue the dialogue at any time, and that the consequence of his waiver is that his words may be used against him later in a court of law. *Leza*, 351 S.W.3d at 350.

On the issue of Appellant's knowing and intelligent waiver, the trial court made the following explicit credibility findings:

- Appellant's testimony that he did not understand his rights very well was not credible;

- Barakat's testimony that Appellant seemed to understand the warnings was "highly credible, especially given [Appellant's] behavior during the interview showing his ability to understand Barakat"; and

- the court interpreter's testimony that Barakat could "definitely" be understood was credible.

The court further found that Appellant "had the required level of comprehension of the right to be waived." The court concluded that "[t]he weight of the credible evidence reveals that [Appellant] had the required level of comprehension of his rights even given the Spanish translation of the warnings." Appellant indicated orally and by affirmative gesture that he understood each of those rights. He then agreed to talk with the detectives and proceeded to answer the detectives' questions. And when asked at the suppression hearing about how he thought he would get a lawyer based on the warning given, he testified he never thought about it. The record supports the trial court's findings that Appellant understood the rights that he was waiving.

Appellant points to the adequacy of the *Miranda* and Art. 38.22 warnings to contend that because the warnings were inadequate, he was not adequately informed of his right to appointed counsel. According to Appellant, any implicit waiver of his rights was therefore not knowing or intelligent. But as we have previously concluded, the warnings given to Appellant were the effective equivalent of the required constitutional and statutory warnings and thus, were adequate to protect Appellant's *Miranda* and Art. 38.22 rights.

Appellant also contends that his waiver was not knowing and intelligent because, as a Mexican national, he is largely ignorant of the U.S. legal system. However, while familiarity with the criminal justice system may be a factor to consider in waiving constitutional rights, it is not a dispositive factor. *See, e.g.*, *Parke v. Raley*, 506 U.S. 20, 37 (1992) (treating evidence of defendant's prior experience with criminal justice system as

relevant to question of whether he knowingly waived constitutional rights). Appellant was twenty-eight years old at the time of the interrogation and had been living in the U.S. for approximately a decade. *See, e.g.*, *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 361 (2006) (Ginsburg, J., concurring) (observing that defendant with eleven years of "life experience" in the U.S. "scarcely resembles the uncomprehending detainee" contemplated by Vienna Convention). He had a high school education, and the record supports the trial court's conclusion that Appellant had the required level of comprehension to support the knowing waiver of his rights. Appellant fails to explain how his purported unfamiliarity with the U.S. legal system rendered his waiver unknowing.

Moreover, the evidence at the suppression hearing demonstrated that, less than two months before his interrogation, Appellant had been arrested and warned of his *Miranda* and Art. 38.22 rights in Spanish in the presence of a magistrate. Campos, who provided the Spanish warnings in July 2017, testified that he read the Spanish version of the warning form to Appellant, and Appellant acknowledged his rights by signing the English version of the form, which was customary at the Arlington Jail. At the hearing, Appellant acknowledged his signature on both warning forms. While Appellant denied receiving those warnings and said that he was unable to understand Campos' dialect, the trial court found that Appellant was not credible in this testimony. The court found, that even though Appellant was unfamiliar with the U.S. criminal justice system, he had been exposed to the required warnings two months prior to his interrogation in September 2017.

Appellant further argues that the waiver of his *Miranda* rights was not knowing and intelligent because he was not informed of the subject of the interview or the charges

against him.  But nothing in *Miranda* requires a suspect to be informed of the topic of a custodial interview: "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 577 (1987); *see Burbine*, 475 U.S. at 422 (observing that Supreme Court "[has] never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights"); *see, e.g.*, *Leza*, 351 S.W.3d at 349–50 (holding that failure to inform defendant he was being questioned about capital murder and not traffic offense was "patently insufficient" to render his waiver of *Miranda* either involuntary or insufficiently informed).

Furthermore, while it is true that neither detective expressly informed Appellant that they wanted to question him about the capital murder of which he was suspected before Barakat gave Appellant the warnings, he informed Appellant that he was here on a new charge and that they were investigating a new case.  At the end of the warnings, Barakat asked Appellant if he still wanted to talk about the new case.  As the trial court found, Appellant clearly knew the detectives were investigating a new case, even if the detectives did not inform him of the nature of that case.  When the detectives were trying to establish Appellant's relationship to Zelaya, Appellant spontaneously confessed to killing Zelaya before being told by the detectives that he was dead. The evidence reflects that Appellant was aware of the crime that the detectives were investigating.

Appellant next asserts that the detective's failure to advise him of his rights under Article 36 of the Vienna Convention on Consular Relations is a factor that weighs against

a finding that his waiver was valid. Article 36 "addresses communication between an individual and his consular officers when the individual is detained by authorities in a foreign country." *Sanchez-Llamas*, 548 U.S. at 337; *see also* Vienna Convention on Consular Relations art. 36(1)(b), Apr. 24, 1963, 21 U.S.T. 77, 100–101, 595 U.N.T.S. 261, 292 (ratified by the United States on Nov. 24, 1969)). The Vienna Convention states that, if the foreign national requests, authorities must notify, without delay, the consular officers of the foreign national's home country and must inform the foreign national, without delay, of his right to request assistance from his consulate. *Sanchez-Llamas*, 548 U.S. at 338–39; *see Sierra v. State*, 218 S.W.3d 85, 87 (Tex. Crim. App. 2007). However, "Article 36 has nothing whatsoever to do with searches or interrogations. Indeed, Article 36 does not guarantee defendants *any* assistance at all. The provision secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention—not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention." *Sanchez-Llamas*, 548 U.S. at 349. As we have observed, the failure to inform an accused of his right under Article 36 is unlikely "to produce unreliable confessions," and that "there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police." *Sandoval v. State*, 665 S.W.3d 496, 524 (Tex. Crim. App. 2022) (quoting *Sanchez-Llamas*, 548 U.S. at 340).

The trial court found it undisputed that Appellant was not informed of his right to have the Mexican Consulate notified of his arrest. Appellant testified at the suppression hearing that, had the consulate official met with him before his interrogation, he would not have spoken to the detectives. However, Appellant's consular notification right is distinct

from his Fifth Amendment rights, and thus, we cannot discern any relevance to his waiver of those rights with the lack of notification to the Mexican Consulate. *See Sanchez-Llamas*, 548 U.S. at 349 (observing that reasons for requiring suppression for Fourth and Fifth Amendment violations "are entirely absent from the consular notification context"). Given the other factors demonstrating a knowing and intelligent waiver, we agree with the trial court that the lack of consular notification does not demonstrate that Appellant's implicit waiver of his Fifth Amendment and statutory rights was invalid.

Finally, Appellant contends that his testimony at the suppression hearing demonstrated that he did not knowingly and intelligently waive his *Miranda* rights. It is true, as noted above, that Appellant testified that he did not understand his rights and would not have waived them had he understood them or had he been advised by consular officials not to speak with law enforcement. But the trial court was not required to credit Appellant's testimony. *See Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007) ("We have held that the trial court is 'the sole and exclusive trier of fact and judge of the credibility of the witnesses' and the evidence presented at a hearing on a motion to suppress, particularly where the motion is based on the voluntariness of a confession."); *Green v. State*, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996); *Waller v. State*, 648 S.W.2d 308, 311 (Tex. Crim. App. 1983); *Aranda v. State*, 506 S.W.2d 221, 225 (Tex. Crim. App. 1974). The trial court was entitled to believe that Appellant's testimony was not credible. *See McKittrick v. State*, 541 S.W.2d 177, 184 (Tex. Crim. App. 1976) ("trial judge is the trier of facts and can accept or reject the testimony of the witnesses, including a defendant, in determining the issues before him").

The trial court found that there was no evidence that Appellant was of low intelligence, observing that Appellant stopped to think about answers before responding to questions and sought clarification from the detectives when necessary. The court found that, based on his responses to the detectives' questions and his conduct during the interview, Appellant showed that he understood the rights he was waiving. Ultimately, the trial court concluded, based on the totality of the circumstances and the preponderance of the credible evidence, that Appellant's waiver of his Fifth Amendment rights was valid. We agree.

Viewing the evidence and all reasonable inferences in the light most favorable to the trial court's ruling, we conclude that the trial court did not abuse its discretion in concluding that Appellant's waiver was voluntary, knowing, and intelligent. *See Burbine*, 475 U.S. at 422–23 ("Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."). We overrule point of error two.

### *General Voluntariness*

In point of error three, Appellant asserts that his statements were involuntary under Art. 38.21 and 38.22 due to: his lack of sleep; his general unfamiliarity with the U.S. legal system; law enforcement's failure to notify the Mexican Consulate of his arrest before his interrogation; the detectives' failure to inform him of the subject of the interrogation; and Barakat's failure to adequately inform him of his *Miranda* and Art. 38.22 rights. Appellant

claims that he was sleep deprived, rendering his decision to talk to the detectives involuntary. Appellant testified at the suppression hearing that he was fatigued because he hadn't slept in about a week and only spoke to the detectives because he was trying to find a way to be left alone.

Under Art. 38.21, a statement made by an accused person may be used as evidence against him if the statement was freely and voluntarily made without compulsion or persuasion. *See* Tex. Code Crim. Pro. Ann. art. 38.21. If a question "is raised as to the voluntariness of a statement, the court must make an independent finding in the absence of the jury" as to whether the statement was voluntarily made. *See* Tex. Code Crim. Pro. Ann. art. 38.22, Sec. 6. When reviewing a general voluntariness claim, courts have considered the following factors: whether the defendant was advised of his constitutional and statutory rights; the conditions under which the defendant was questioned; the defendant's age, education, and intelligence level; the defendant's physical or mental impairment, such as intoxication, illness, the influence of medication or drugs, or other disabilities; and the use of physical punishment or coercive tactics, such as the deprivation of food or sleep, threats, or intimidation. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Oursbourn*, 259 S.W.3d at 172–73.

Claims of involuntariness based on the defendant's state of mind when making the statement are to be resolved by Art. 38.22, Sec. 6, which is aimed at protecting suspects from law enforcement overreach. *Oursbourn*, 259 S.W.3d at 171-72 (quoting *Connelly*, 479 U.S. at 167). But claims of general involuntariness need not be predicated on law enforcement overreach. *Lopez v. State*, 610 S.W.3d 487, 495 (Tex. Crim. App. 2020). Such

claims could also involve inquiring into the defendant's state of mind during his confession. *Id.* While lack of sleep is a circumstance to consider when determining whether a statement was voluntarily made, tiredness alone does not show that the defendant's capacity for self-determination was impaired. *See Sandoval*, 665 S.W.3d at 524; *see also Chambers v. State*, 866 S.W.2d 9, 20 (Tex. Crim. App. 1993) (lack of sleep through fault of defendant will not support finding of involuntariness).

Here, Appellant asserted that he only talked to the detectives because he was tired and wanted to be left alone but, as we have mentioned, his behavior during the interrogation revealed otherwise. The only evidence of sleep deprivation was Appellant's testimony that he hadn't slept in about a week. Based on the video recording of Appellant's interrogation, the trial court found that Appellant did not appear sleep deprived or tired during the interrogation, nor did he mention being tired during the interrogation. Ultimately, the trial court found Appellant's testimony not credible. We agree with the trial court that the record does not support Appellant's sleep deprivation claim.

The record shows that Barakat testified that Appellant did not appear to be tired during his interview; rather, Appellant seemed coherent. Gildon also testified that Appellant was coherent and able to follow questions. Additionally, the video of Appellant's interview rebuts his claim of exhaustion. Nothing in the video indicates that Appellant was having difficulty staying awake, nor did Appellant state that he was tired. Rather, the video demonstrates that Appellant was engaged in a coherent dialogue with the detectives. Even if Appellant was tired during the interview, a claim of tiredness or lack of sleep itself does not render a statement involuntary. *See Sandoval*, 665 S.W.3d at 524;

*Chambers*, 866 S.W.2d at 20.

For the reasons previously discussed, we agree with the trial court's determination that the other circumstances raised by Appellant did not render his statement involuntary. The record supports the trial court's findings and conclusions that Appellant's statements were freely and voluntarily made. Thus, the trial court did not abuse its discretion in denying Appellant's motion to suppress his custodial statements to detectives on the ground that his statements were involuntary under Art. 38.22. We overrule point of error three.

### Denial of Motion to Suppress Search Warrant Evidence

In two points of error, Appellant contends that the trial court erred in denying his motion to suppress the evidence seized from his Burton Drive residence. Specifically, Appellant asserts that the affidavit supporting the search warrant for his residence failed to establish probable cause.[14] Therefore, Appellant argues, the failure to suppress the seized evidence violated the Fourth Amendment of the United States Constitution (point of error thirteen) and Art. I, Sec. 9 of the Texas Constitution (point of error fourteen).

### Background

_____

[14] During his investigation, Gildon obtained 23 search warrants. Appellant filed a pretrial motion seeking to suppress all the evidence obtained from each of the search warrants. In the motion, he argued that the affidavit supporting the search warrant for the Burton Drive residence, which formed the basis for subsequent search warrants, failed to establish probable cause because the affidavit relied on unnamed witnesses and anonymous Crime Stoppers tips. On appeal, Appellant complains about the denial of his motion to suppress only as to the evidence seized upon the execution of the Burton Drive search warrant.

In his affidavit before the magistrate, Detective Gildon accused Mariano Sanchez-Pina of "intentionally and knowingly caus[ing] the death of the victim, an unknown Hispanic male, by cutting off his head." The affidavit's "facts and information" section began with Gildon's recitation about being informed of the discovery of human remains on Truman Street in Arlington. The detective described responding to the location and observing a human next to a sign that stated, "La Raza Se Restreta y Falton 4." He asserted his belief that "the head was severed from a human body with a large knife or sharp object."

The affidavit next contained information obtained from Sanchez-Pina, who was identified as the suspect in the affidavit. The affidavit reflected that patrol officers had arrested Sanchez-Pina, and he told them that he could provide information about the body that had been found and asked to speak to detectives. Per the affidavit, the arresting officers reported to Gildon that Sanchez-Pina told them that he was "taken by several guys and forced to watch a murder happen," and "described being tied up at an unspecified location and witnessing a subject being stabbed to death."

The affidavit stated that Gildon and Barakat went to the Arlington Police Department to speak with Sanchez-Pina. It then recited the information that Sanchez-Pina provided to the detectives, which included the following:

- a subject known by the street name "Cholo" had accused Sanchez-Pina of stealing money and was threatening to kill him;

- on September 1, 2017, Cholo and a subject named "Diablo" came to Sanchez-Pina's residence, but he refused to open the door because he was scared, and they left;

- later that day, Sanchez-Pina received a phone call from Cholo

instructing him to come to his residence and threatening that, if he did not, Cholo would kill him;

- Sanchez-Pina went to Cholo's residence, which he identified on a map as 202 Burton Drive; upon arrival, Sanchez-Pina opened the front door slightly and saw a dead male on the living room floor; a jacket was covering the person's head, but Sanchez-Pina could tell it was Diablo based on the clothing; Sanchez-Pina became fearful and left;

- after Sanchez-Pina returned home, Cholo called him again and told him to come back to his residence, again threatening to kill him if he did not;

- when Sanchez-Pina returned to Cholo's residence, he was instructed to go the backyard, where he saw Cholo digging a large hole; several others were in the backyard watching Cholo dig the hole; Cholo told Sanchez-Pina that "he wanted him to see how they handled things," and Sanchez-Pina then left;

- Sanchez-Pina did not know Diablo's real name or Cholo's real name, but he confirmed that both had been living at 202 Burton Drive;

- Sanchez-Pina had witnessed Cholo and the other residents of 202 Burton Drive in possession of firearms and other weapons; and

- Sanchez-Pina confirmed that Diablo was from El Salvador and had a girlfriend who was seventeen.

The affidavit next contained information provided by a witness who was not named in the affidavit:

While your Affiant and Detective Barakat were speaking with the suspect, other officers continued looking for possible witnesses around the scene. Officers located a witness, who was fully identified and is available to testify, who observed the suspect and another male subject talking about "Diablo" previously burglarizing the suspect's apartment. The two subjects were caught on video, which was provided to officers. After the unknown subject left, the suspect told the witness he had to leave because the unknown subject was going to kill somebody and he was going to record it.

The affidavit then reflected that, after meeting with that witness, Gildon received

information about a Crime Stoppers tip:

> Your Affiant was then contacted by the Arlington Police Department Tactical Intelligence Unit and informed they had received a Crime Stoppers Tip from an anonymous source referenc[ing] this investigation. The subject stated they were calling [in] reference [to] the murder investigation. The caller stated a male subject named[] Alexis Acosta, who goes by the alias[] "Le Cholo," had been showing pictures on his phone of the crime scene. The subject was believed to have a tattoo on his arm that reads "el mas odiado." A search of this subject's information revealed his possible identity to be Hector Acosta-Ojeda, Hispanic male, date of birth 08/25/89. This subject was stopped by Patrol Officers on 07/20/17, after leaving 202 Burton Drive, Arlington, Texas, and subsequently arrested.

The affidavit next reflected that the detectives met with another unnamed witness:

> Your Affiant and Detective Barakat then met with another witness, who has been fully identified and is available to testify. The witness stated on 09/01/17, the suspect contacted her while she was at work and wanted to talk. She informed him she was busy[,] but he could meet her on her dinner break at Taco Bell. While seeing each other on her dinner break, the suspect appeared upset. He told the witness that earlier that day multiple subjects picked him up and forced him to go to the residence at 202 Burton Drive. Once there, the suspect stated "Cholo" made him cut off the arms of the victim. She stated she believes there is possible evidence on the suspect's cell phone, which she turned over to Detectives.

The affidavit stated that the detectives then showed Sanchez-Pina a photo spread containing a photo of Appellant, and Sanchez-Pina identified Appellant as the person that he knew as "Cholo." They showed Sanchez-Pina a photograph of the severed head, and he identified it as the person he knew as "Diablo." Sanchez-Pina also described what he was wearing the night "Diablo" was killed and told the detectives where to find his (Sanchez-Pina's) clothing and shoes.

The affidavit then reflected that Gildon received another Crime Stoppers tip:

> After speaking with the witness, your Affiant received another Crime Stoppers Tip from a male subject who stated he had an employee who told

him about the murder. He stated his employee knows a subject named Alexis Acosta, whom he stated murdered the victim. He further stated Acosta was showing photographs of the victim's severed head. He then stated Acosta told him he killed the victim and his 17 year old girlfriend. He stated the subject also had the tattoo on his arm that read, "el mas odiado."

Gildon concluded his affidavit by asserting that, based on information provided by witnesses and "the suspect," he believed that probable cause existed for the issuance of a search warrant for the residence at 202 Burton Drive:

> to search for evidence of blood at the location, any human remains that could be located at the location, any knives or sharp[-]edged weapons that could have been used to severe [sic] the victim's head, any and all cellular telephones capable of taking and maintaining photographs and videos that could be evidence in this case, photographs of the location, and any other items believed to be evidence of the offense of Murder.

The trial court found that probable cause existed and signed the warrant authorizing the search of 202 Burton Drive and the seizure of the described evidence. The police executed the search warrant that same day. They discovered, among other things, the bodies of Zelaya and Chirinos, blood evidence in the house and backyard, a machete, and ammunition casings. The evidence obtained pursuant to the Burton Drive warrant was admitted at Appellant's trial.

After Appellant's trial, the trial court issued findings of fact and conclusions of law concerning the denial of Appellant's motion to suppress the evidence obtained pursuant to the search warrants. Concerning the Burton Drive warrant, the trial court made the following findings and conclusions:

4. Mariano Sanchez-Pina is named in the affidavit.

5. The affidavit contains the information obtained from two unnamed individuals who had been fully identified by law enforcement and were

available to testify, and two anonymous individuals who had provided Crime Stoppers tips.

6. The affidavit does not contain a statement about the credibility or reliability of the two unnamed individuals who had been identified or the anonymous individuals who had provided the Crime Stoppers tips.

7. The affidavit does not contain a statement that the unnamed individuals were private citizens whose only contact with law enforcement was as a witness to the crime.

…

45. The affidavit for Search Warrant No. 06-17-037-SW contains the statements of Mariano Sanchez-Pina:

- Upon being arrested, Sanchez-Pina informed officers that he had been tied up at an unspecified location and witnessed a subject being stabbed to death;

- Sanchez-Pina then gave a statement to detectives about what he had observed;

- Sanchez-Pina had known "Cholo" for years;

- Sanchez-Pina stated that "Cholo" and "Diablo" came to his residence, 710 Truman Street in Arlington, Texas, on September 1, 2017;

- Later, on September 1, 2017, Sanchez-Pina received a phone call from "Cholo" instructing him to come to "Cholo's" residence, 202 Burton Drive in Arlington, Texas;

- When Sanchez-Pina arrived at 202 Burton Drive, he saw a male subject, who he believed to be "Diablo," dead on the living room floor;

- Sanchez-Pina had known "Diablo" for approximately one week;

- Sanchez-Pina became fearful and went back home;

- After getting home, Sanchez-Pina received another call from "Cholo" instructing him to come back to 202 Burton Drive or "Cholo" would kill Sanchez-Pina;

- Sanchez-Pina returned to 202 Burton Drive and went to the backyard where he saw "Cholo" digging a hole;

- Sanchez-Pina stated "Cholo" told him that he wanted Sanchez-Pina to see how "they handle things";

- Sanchez-Pina stated on the night "Diablo" was killed, Sanchez-Pina was wearing white van shoes, blue jeans, and a red striped shirt;

- Sanchez-Pina stated the red striped shirt was at his residence, 710 Truman Street in Arlington, Texas; and

- Sanchez-Pina stated that the red striped shirt would appear to have blood on the front, but it was not blood.

46. The statements of Sanchez-Pina are a detailed first-hand account of what he personally observed.

47. The statements of Sanchez-Pina are corroborated by the physical evidence and information provided by unnamed informants.

48. Sanchez-Pina was shown a photo spread containing Defendant, and he identified Defendant as the person he knows as "Cholo."

49. After Sanchez-Pina stated that he had seen "Diablo" deceased at 202 Burton Drive, he identified the photograph of the severed head found in the 400 block of Truman Street as belonging to "Diablo."

…

54. The information from the unnamed informants, standing alone, is insufficient to establish probable cause, but it is a circumstance the magistrate could have considered, along with all the other circumstances in the affidavit, in determining that probable cause existed to issue the search warrant.

55. Collectively, the unnamed informants corroborated that an individual known as "Cholo" or "Le Cholo" had killed someone at 202 Burton Drive[,] and Sanchez-Pina had first-hand information about that person's death.

56. Defendant was arrested after leaving 202 Burton Street in Arlington, Texas on July 20, 2017, which predated this search warrant and

demonstrated Defendant's connection to that residence.

…

58. Giving proper deference to the magistrate's decision, the totality of the facts contained in the affidavit, when read in a common-sense and non-technical manner, establish probable cause to issue a search warrant for the residence located at 202 Burton Drive.

59. Furthermore, if the information from the unnamed informants is excised from affidavit, the totality of the circumstances provided in the remainder of the affidavit sufficiently establish probable cause to support issuance of the search warrant for 202 Burton Drive.

(Internal citations omitted.) The trial court upheld the magistrate's probable cause determination and issuance of the Burton Drive search warrant.

**Standard of Review**

Under the Fourth Amendment and its Texas equivalent, issuance of a search warrant depends on probable cause. *Diaz v. State*, 632 S.W.3d 889, 892–93 (Tex. Crim. App. 2021); *see* U.S. CONST. amend. IV (providing that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized"); TEX. CONST. art. I, § 9 (providing that "no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation"). Probable cause exists when, under the totality of the circumstances, there is a fair probability that evidence of a crime will be found at the specified location. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012). The test for finding probable cause is whether a reasonable reading by the magistrate would lead to the conclusion that the four corners of the affidavit provide a

'substantial basis' for issuing the warrant. *State v. Elrod*, 538 S.W.3d 551, 557–58 (Tex. Crim. App. 2017) (quoting *Duarte*, 389 S.W.3d at 354).

If a search warrant affidavit relies on information from an informant, the issue is whether the information is sufficiently reliable or the informant credible such that the magistrate had a substantial basis for crediting the information. *Duarte*, 389 S.W.3d at 356–58. If the facts contained within the affidavit support an inference that the informant is credible or the information is reliable, then the informant's information can supply probable cause. *Diaz*, 632 S.W.3d at 893. The credibility of informants depends on what type of informant they are. *Id.* A citizen-informer is presumed to speak honestly and accurately. *State v. Le*, 463 S.W.3d 872, 878 (Tex. Crim. App. 2015); *see Duarte*, 389 S.W.3d at 357 ("Citizen informants are considered inherently reliable; confidential informants are not.").

Information obtained from anonymous or first-time confidential informants of unknown reliability must be coupled with facts from which an inference may be drawn that the informant is credible or that his information is reliable. *Duarte*, 389 S.W.3d at 357. Such an inference may be drawn if the information given is corroborated, is a statement against the informant's penal interest, is consistent with information provided by other informants, is a detailed first-hand account, is combined with an accurate prediction of the subject's future behavior, or when there is a substantial basis for crediting the hearsay. *Id.* at 356–57. The requirement of facts showing credibility or reliability does not apply to information obtained from citizens who freely share the information with police without withholding their names. *See West v. State*, 720 S.W.2d 511, 513 n.2 (Tex. Crim. App.

1986) (declining to view information given by citizens who report a crime and freely share information with police with the same suspicion usually reserved for anonymous police informants with an unproven record of reliability).

Because of the constitutional preference for searches to be conducted pursuant to a warrant, we apply a highly deferential standard when reviewing the magistrate's decision to issue a search warrant. *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013). We interpret the affidavit in a commonsensical and realistic manner, and we defer to all reasonable inferences that the magistrate could have made. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). We consider the totality of the circumstances and determine whether there are sufficient facts stated within the four corners of the affidavit, coupled with reasonable inferences from those facts, to establish a fair probability that evidence of a particular crime would likely be found at a specified location. *Rodriguez v. State*, 232 S.W.3d 55, 62 (Tex. Crim. App. 2007). The focus is not on what other facts could or should have been included in the affidavit; the focus is on the combined logical force of facts that are in the affidavit. *Elrod*, 538 S.W.3d at 560 (quoting *Duarte*, 389 S.W.3d at 354–55).

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [him or her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Ultimately, the test is whether the affidavit, when read in a commonsensical and realistic manner and afforded all reasonable inferences

from the facts contained within, provided the magistrate with a substantial basis for the issuance of a warrant. *Foreman v. State*, 613 S.W.3d 160, 164 (Tex. Crim. App. 2020); *see Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007) (affirming that reviewing court must consider totality of circumstances in determining existence of probable cause: "a divide-and-conquer or piecemeal approach is prohibited"); *Le*, 463 S.W.3d at 878 (stating that probable cause is "a flexible, non-demanding standard").

So long as the magistrate had a substantial basis for concluding that probable cause existed, we will uphold the decision to issue a search warrant. *Elrod*, 538 S.W.3d at 557; *see Jones v. State*, 364 S.W.3d 854, 857 (Tex. Crim. App. 2012) ("Although the reviewing court is not a 'rubber stamp,' 'the magistrate's decision should carry the day in doubtful or marginal cases, even if the reviewing court might reach a different result upon *de novo* review.'") (quoting *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010)). When the trial court makes express findings of fact, we examine the record in the light most favorable to the ruling and uphold those fact findings if the record reasonably supports them. *Martin v. State*, 620 S.W.3d 749, 759 (Tex. Crim. App. 2021).

## Analysis

Appellant asserts that the affidavit supporting the Burton Drive search warrant failed to establish probable cause because it lacked sufficient facts to establish the credibility of the witnesses or the reliability of their information.[15] In his assertion, Appellant treats all

---

[15] Art. I, Sec. 9 of the Texas Constitution contains no requirement that a seizure or search be authorized by a warrant. *Foreman v. State*, 613 S.W.3d 160, 164 (Tex. Crim. App. 2020) (quoting *Hulit v. State*, 982 S.W.2d 431, 436 (Tex. Crim. App. 1998)). The inquiry is whether, under the

witnesses who provided information to the police as either confidential informants or anonymous tipsters. However, Sanchez-Pina was a named informant who was an eyewitness to criminal activity in which he participated. After his arrest, he provided specific information to police regarding alleged criminal activity involving Zelaya's murder that took place at Appellant's residence. This Court has consistently held that when a probable cause affidavit specifies a named informant as supplying the information upon which probable cause is based, the affidavit is sufficient if the information given is sufficiently detailed to suggest direct knowledge on the informant's part. *See Elrod*, 538 S.W.3d at 559; *Matamoros v. State*, 901 S.W.2d 470, 478 (Tex. Crim. App. 1995); *Avery v. State*, 545 S.W.2d 803, 804 (Tex. Crim. App. 1977).

Appellant acknowledges the Court's prior holdings concerning named informants but contends that Sanchez-Pina should not enjoy the presumption of reliability because his information is contradictory, lacks detail, and does not constitute a statement against penal interest. It is true that Sanchez-Pina first told arresting officers that he witnessed a murder at an unspecified location but then later reported to the detectives that he encountered Zelaya deceased on the floor after being summoned by Appellant to the Burton Drive residence. However, we do not find these statements to be mutually exclusive. An unspecified location does not mean that the location is unknown. And Sanchez-Pina's

---

totality of the circumstances, the search or seizure was reasonable. *Id*. On appeal, the only aspect of the search of Appellant's residence that he believes to be unreasonable is the same aspect that he finds objectionable under the Fourth Amendment—the lack of probable cause underlying the Burton Drive search warrant. Therefore, our analysis under Art. I, Sec. 9, is the same as our Fourth Amendment analysis.

statements about witnessing a murder and then later seeing that the victim was dead are not inconsistent. Additionally, Sanchez-Pina told the detectives that Zelaya had been stabbed and while the cause of Zelaya's death was determined to be from multiple gunshot wounds, the medical examiner also testified that he had been stabbed nineteen times. Thus, we do not find the information supplied by Sanchez-Pina to be contradictory.

Even if his statements appear to be conflicting, the question is not whether Sanchez-Pina might be a credible witness at trial for the purpose of proving beyond a reasonable doubt that Zelaya was murdered at Appellant's residence. Instead, the question is whether Gildon could rely upon Sanchez-Pina's statements as just one of several factors when making a probable cause determination. *See State v. Ford*, 537 S.W.3d 19, 25 (Tex. Crim. App. 2017). When considered together, Sanchez-Pina's statements connect him, Appellant, and the Burton Drive residence with Zelaya's murder.

As for Appellant's complaint that Sanchez-Pina's information lacked detail, we disagree. Gildon's affidavit is sufficiently detailed to suggest direct knowledge on Sanchez-Pina's part. Sanchez-Pina described his interactions with Appellant and his personal observations of events related to Zelaya's murder. He gave specific facts about the severed head, the circumstances of Zelaya's death and dismemberment, the location of Zelaya's body, and the hole that was dug to bury Zelaya's body. He was able to give these details because he observed them. Sanchez-Pina had first-hand knowledge of Zelaya's murder, as well as Appellant's attempts to conceal the evidence by burying the body. The particularized facts given by Sanchez-Pina adequately show that he had personal or direct knowledge of the matters he asserted. *See, e.g.*, *Wilkerson*, 726 S.W.2d 542, 545 (Tex.

Crim. App. 1986) (information related by witness suggests personal and direct knowledge and is entitled to credibility).

Finally, Appellant argues that Sanchez-Pina's information does not constitute a statement against interest. The statement against interest exception to the hearsay rule originates in the commonsense notion that people ordinarily do not say things that are damaging to themselves unless they believe that those statements are true. *Walter v. State*, 267 S.W.3d 883, 890 (Tex. Crim. App. 2008). In the information he volunteered to the detectives, Sanchez-Pina placed himself at the stabbing of Zelaya, in the presence of Zelaya's dead body, and at the subsequent efforts to conceal the body. Nevertheless, even if Sanchez-Pina's statements did not subject him to criminal liability, being a statement against interest is only one way to show the reliability of an informant's information. We have already determined that the information Sanchez-Pina gave was reliable as a detailed first-hand account of Zelaya's murder. Furthermore, his statements were corroborated and consistent with information received from other informants.

Appellant treats the two unnamed witnesses as confidential informants or anonymous tipsters. However, these types of informants are treated the same when evaluating the information given in support of warrants; their reliability depends on facts from which an inference may be drawn that they are credible or that their information is reliable. *Diaz*, 632 S.W.3d at 893; *Duarte*, 389 S.W.3d at 357. Their credibility or reliability must be demonstrated within the four corners of the affidavit. *Id*.

Here, Gildon stated in his affidavit that these two witnesses were identified and available to testify. While these witnesses were not named in the affidavit, we find it

reasonable to treat them as citizen informers rather than confidential informants or anonymous tipsters. *See West*, 720 S.W.2d at 513 n.2. Both witnesses provided their name and their contact information to law enforcement which can be inferred from their availability to testify at Appellant's trial. Further, both witnesses met with the detectives in person and provided physical evidence. One witness reported a conversation between Sanchez-Pina and an unknown male talking about Zelaya's prior burglarizing of Sanchez-Pina's apartment and an anticipated murder. The detectives were then provided with a video that captured that conversation which, in turn, corroborated the witness' statements. The second witness provided information that corroborated Sanchez-Pina's statement that he was forced to go to Appellant's residence. This witness also provided information that inculpated Sanchez-Pina in Zelaya's murder—that Appellant made him cut off Zelaya's arms. The witness then gave Sanchez-Pina's cell phone to law enforcement because she believed it contained evidence of the murder.

These witnesses were neither confidential informants acting on a quid pro quo basis nor were they anonymous tipsters; they were ordinary citizens. In turn, the affidavit was not required to show that both witnesses were credible. *See Marquez v. State*, 725 S.W.2d 217, 233 (Tex. Crim. App. 1987) (explaining that "as a matter of constitutional law an ordinary citizen as a witness in a case . . . is presumed to be reliable and no special showings are required"). Nevertheless, these witnesses disclosed their identities to law enforcement, met with the detectives, provided evidence to the detectives, and made themselves available to testify. These are facts from which an inference may be drawn that these witnesses are credible and that their information is reliable. *See Ford*, 537 S.W.3d at 26

(explaining that "a court cannot simply discount the information given by an informant without looking at the circumstances that corroborate the information").

Finally, the affidavit included information provided by two anonymous Crime Stoppers tips. The first tipster identified Appellant by name, supplied Appellant's street name, and described a tattoo on his arm. This tip also asserted that Appellant had been showing pictures of the crime scene on his phone. The second tipster also identified Appellant by name and street name and described the same tattoo as the first tipster. This tipster further stated that Appellant told his employee that he murdered Zelaya and was showing photographs of his severed head to people. Both tipsters provided information that was consistent with information received by other witnesses.

Considering the totality of the circumstances, we hold that Detective Gildon's affidavit sufficiently established probable cause to justify the issuance of the search warrant for Appellant's Burton Drive residence. From the face of the affidavit, the magistrate had a substantial basis to find, either directly or through reasonable inference, that there was a fair probability that evidence of a crime would be found at Appellant's residence at the time the affidavit was signed. *See Elrod*, 538 S.W.3d at 556 (observing that "although the magistrate's determination of probable cause must be based on the facts contained within the four corners of the affidavit, the magistrate may use logic and common sense to make inferences based on those facts"). Thus, the trial court did not abuse its discretion in denying Appellant's motion to suppress the evidence seized from his residence. We overrule points of error thirteen and fourteen.

**Nationality as Evidence of Future Dangerousness**

In three points of error, Appellant complains that in presenting evidence of his cartel affiliations and then referencing that evidence in closing argument, the State improperly highlighted his Mexican nationality.  Appellant contends that the invocation of his Mexican nationality as evidence of future dangerousness violated his Fourteenth Amendment rights to equal protection and due process (point of error five), constituted prosecutorial misconduct that violated his right to due process (point of error six), and violated Art. 37.071, Sec. 2(a)(2) (point of error seven).

As a preliminary matter, we disagree with Appellant's characterization of the record.  The State presented evidence and argued to the jury that Appellant was a future danger for several reasons, including his affiliation with Mexican drug cartels and his role as a hitman for them.  However, though the evidence showed that Appellant was from Mexico, the State did not offer specific evidence of Appellant's nationality as evidence of future dangerousness, nor did the State argue that Appellant was a future danger because he is Mexican or from Mexico.  Even so, we address Appellant's arguments point by point.

**Background**

During the punishment phase of Appellant's trial, the State offered the testimony of Chirino's brother, Edgar Macias, who described the murder of Triston Algiene at the hands of Appellant in July 2017.  On the night of Algiene's murder, Macias went to visit Chirinos at Appellant's residence.  While there, Macias drank alcohol, smoked methamphetamine, and ingested Xanax with Appellant, Zelaya, and three other men.  At one point in the evening, Macias went to get more alcohol and when he returned, he found Algiene tied up

in Appellant's room with a blanket over his body. Macias witnessed Appellant shoot Algiene in the head and then get shovels from the garage. He also observed a hole in the concrete floor of Appellant's bedroom. Roughly two weeks after the murder, Macias was arrested for possession of body armor while driving with Appellant. Concerned he would be implicated in Algiene's murder, Macias reported his story to Detective Gildon. Eventually, Algiene's body was excavated from underneath the flooring of Appellant's bedroom and an autopsy revealed that his body had been cut in half. Appellant was subsequently charged with capital murder for the death of Algiene.

During Detective Gildon's punishment testimony, the State presented several images and posts from Appellant's Facebook account. In two photographs, Appellant is seen wearing the body armor that law enforcement seized when Macias and Appellant were arrested. In a Facebook post, Appellant discussed getting revenge for the shooting on Truman Street. His Facebook account also contained pictures of drug activity.

The State also presented evidence of Appellant's self-proclaimed membership in several Mexican drug cartels. Corporal Ruben Martinez, a gang officer for the Tarrant County Sheriff's Office, testified about his encounter with Appellant while he was booked into jail for the instant offense. Martinez explained that he identifies gang members coming into the jail to separate inmates by affiliation for safety and security reasons. He testified that he interviewed Appellant at the jail because his clothing and tattoos were

representative of gang affiliation and cartel membership.[16]  During the interview, which was conducted in Spanish, Appellant told Martinez that he had been a member of Los Carnalitos and was currently a member of the Cartel del Noreste, a Mexican drug cartel. Appellant explained the operational structure of the cartel and the various roles of its members.  Appellant also disclosed to Martinez that his role in the cartel was as a hitman.

Dr. David Grantham, the director of intelligence for the Tarrant County Sheriff's Office, also testified to Appellant's gang and cartel affiliations.  Dr. Grantham, who had extensive experience studying international criminal organizations, reviewed Martinez's report of his interview with Appellant and the photographs of Appellant's tattoos.  He opined that the information provided by Appellant accurately represented Mexican drug cartels.  Based on Appellant's tattoos and the information he provided in his interview with Martinez, Dr. Grantham had a high degree of confidence that Appellant was a current or former member of Carte del Noreste.

In its closing, the State argued that Appellant was a future danger for several reasons.  The jury was told that it could make its determination based on the facts presented

---

[16] Specifically, Martinez noted that Appellant wore red shoes and had a belt buckle that depicted Al Pacino in his role as the drug lord "Tony Montana" in the movie *Scarface*.  Martinez explained that red shoes can be an indicator of cartel membership and that cartel members often wear clothing that links them to *Scarface*.  He also described Appellant's tattoos, which included: "818," the area code of Monterrey, Mexico where Appellant is from; a marijuana plant; "El mas Odioado," which translates to "the most hated"; three dots, which is a gang indicator particular to Hispanic gangs; a female chola or gangster with a clown face; the letters "c-n-l-s," an abbreviation for Carnalitos, which means "brothers" and is a Mexican gang; the letters "NL," which stand for "Nueva Leon"; the number "13," which is affiliated with "Sur Trece," the Mexican Mafia; the outline of an assault rifle or AK-47, which is an indicator of affiliation with cartels; and a depiction of a production stamp used in Mexico with the words "hecho in Mexico," which translates to "made in Mexico."

regarding the murders of Zelaya and Chirinos and the unrelated murder of Algiene. The State commented the following in regard to Appellant's affiliation with Mexican drug cartels:

> But you know more about him, don't you? How do you feel about Mexican drug cartels, international drug organizations, crime syndicates? If that doesn't strike fear in your hearts. We know he's a part -- if you can't look at his telltale signs at the work he puts in on these bodies and know what he's a part of, he admits it. He tattoos his love of violence on his body, El mas Odiado, the most hated. He has demonstrated a knowledge of the organization to Ruben Martinez. And you know from Dr. Grantham that that knowledge is real and authentic. He's a hit man. I'm a sicario. And that's what the AK-47 tattoo says on his ankle. He has worked his way up in the organization, but he doesn't want to stop there. As you know from the Facebook records, he wants to be a comandante, he wants to be a commander in the organization.

The State also mentioned the testimony of Appellant's expert, Dr. Minagawa, in which he stated that there's a high probability that Appellant is likely to engage in criminal acts of violence in the future. The State did not offer any specific evidence of Appellant's Mexican nationality as evidence of future dangerousness.

## Standard of Review

To preserve a complaint for appellate review, a defendant must make a timely and specific objection to the trial court and obtain an adverse ruling. TEX. R. APP. P. 33.1(a)(1)(A). We have consistently held that the failure to object in a timely and specific manner to the admission of evidence during the trial forfeits complaints about the admission of that evidence on appeal, even when error in its admission concerns a constitutional right. *See Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008); *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002). Similarly, a defendant

forfeits his right to complain on appeal about improper prosecutorial jury argument if he fails to object to the argument and to pursue his objection to an adverse ruling. *Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018); *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). As with the admission of evidence and improper jury argument, the failure to object at trial to alleged prosecutorial misconduct forfeits an appellate claim about the denial of due process for such misconduct. *See Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012).

**Analysis**

We have combined all three points of error. In points of error five, six, and seven, Appellant asserts that the invocation of his Mexican nationality as evidence of future dangerousness violated the Equal Protection and Due Process clauses of the Fourteenth Amendment, violated Art. 37.071, Sec. 2(a)(2), and denied him due process. Appellant argues that the State elicited testimony from Martinez and Dr. Grantham with the intention of highlighting his Mexican nationality, and then improperly referenced his nationality in its closing argument. Appellant believes this testimonial evidence was used by the State to suggest that because he is Mexican, he is more likely to be a future danger and should be sentenced more harshly.

For the Court to review these three grounds, Appellant had to have preserved any alleged error during trial. *See* TEX. R. APP. P. 33.1(a)(1)(A). Appellant acknowledges that he did not object at trial to the testimony at issue or to the State's jury argument referencing it as violating his equal protection and due process rights. Appellant also acknowledges that he did not object to the State's elicitation of the testimony at issue or the State's jury

argument referencing it on the basis that the elicitation and argument constituted prosecutorial misconduct violating his right to due process. Nor did Appellant object to the alleged statutory violation under Art. 37.071. *See* Art. 37.071, Sec. 2(a)(2) (State is prohibited from offering evidence that defendant will engage in future criminal conduct because of defendant's race or ethnicity).

Appellant acknowledges that he did not object on equal protection or due process grounds in the trial court. He further acknowledges our opinion in *Saldano v. State*, in which we held that the failure to object to testimony alleged to have improperly appealed to jurors' racial prejudices in violation of the Equal Protection Clause precluded raising the equal protection claim on appeal. *See* 70 S.W.3d 873, 889 (Tex. Crim. App. 2002). But Appellant nevertheless urges us to reach his complaint and determine that error relating to the admission of evidence of nationality concerns an absolute systemic requirement not subject to forfeiture.

Appellant contends that since *Saldano*, the United States Supreme Court has recognized that the particularly invidious nature of racial bias in criminal prosecutions forecloses application of procedural hurdles that would otherwise bar review of such a claim. However, neither of the cases that Appellant cites addresses procedural default due to the failure to comply with the contemporaneous-objection rule. *See Buck v. Davis*, 580 U.S. 100, 121 (2017) (holding that trial counsel's introduction of expert testimony using race as predictive factor in determining future dangerousness constituted ineffective assistance of counsel); *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017) (holding that Sixth Amendment requires that juror no-impeachment rule give way to permit trial

court to consider evidence of juror's statement indicating that he or she "relied on racial stereotypes or animus to convict a criminal defendant").

The contemporaneous-objection rule protects important policy interests. *See Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002) (explaining rationale for rule); *see also Wainright v. Sykes*, 433 U.S. 72, 88–89 (1977) (detailing many reasons for requiring compliance with contemporaneous-objection rule). Accordingly, we have consistently held that error in the admission of evidence is subject to procedural default, even when the error may involve a constitutional right. *See, e.g.*, *Darcy v. State*, 488 S.W.3d 325, 329 (Tex. Crim. App. 2016); *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008); *see also Henderson v. United States*, 568 U.S. 266, 271 (2013) (observing that "'[n]o procedural principle is more familiar … than that a constitutional right,' or a right of any other sort, 'may be forfeited … by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it'" (quoting *United States v. Olano*, 507 U.S. 725, 731 (1993)). The recent Supreme Court opinions that Appellant relies on—which rightly aim at removing improper considerations of race in the criminal justice system—do not alter or eliminate a state's ability to require compliance with the contemporaneous-objection rule to preserve error, even with respect to error impacting constitutional rights. In turn, we conclude that Appellant failed to preserve his Equal Protection and Due Process claim.

Next, Appellant contends that the State's argument here was so improper that it rises to prosecutorial misconduct in violation of due process. Appellant acknowledges that he did not object to the alleged prosecutorial misconduct at trial. He further acknowledges

that this Court has held that error stemming from improper jury argument relates to a *Marin* category-three right that is forfeitable by inaction. *See Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). Nevertheless, he contends that the State's argument here was so improper that it rises to prosecutorial misconduct in violation of due process. He relies on our opinion in *Grado v. State* to assert that we should hold that the alleged prosecutorial misconduct (the elicitation of evidence and jury argument concerning nationality) is at least a category-two *Marin* waiveable-only right.

Appellant's reliance on *Grado* is misplaced. In *Grado*, we held that "[t]he unfettered right to be sentenced by a sentencing judge who properly considers the entire range of punishment is a substantive right necessary to effectuate the proper functioning of our criminal justice system." 445 S.W.3d 736, 741 (Tex. Crim. App. 2014). Therefore, we classified that right as a *Marin* category-two right. *Id*. In contrast, we have consistently held that error arising from improper jury argument must be preserved by an objection pursued to an adverse ruling; otherwise, any error from it is forfeited. *See Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018) (reaffirming that "[t]he right to a trial untainted by improper jury argument is forfeitable"). Thus, we conclude that Appellant failed to preserve his due process claim.

Finally, Appellant urges us to conclude that the right contained in Art. 37.071, Sec. 2(a)(2) is a *Marin* category-one nonwaivable right because the statute imposes a duty on the trial court to prevent presentation of evidence that the defendant's race or ethnicity makes it likely the defendant will engage in future criminal conduct. Appellant acknowledges that he did not object to the alleged statutory violation at trial. He also

acknowledges that Art. 37.071, Sec. 2(a)(2), predates our opinion in *Saldano*. But he contends that the statute did not factor into our *Marin* category determination because it was not in effect at the time of Saldano's trial. He urges us to conclude that the right contained in Art. 37.071, Sec. 2(a)(2) is a *Marin* category-one nonwaivable right because the statute, although expressing a prohibition on the State, necessarily imposes a duty on the trial court to prevent presentation of evidence (and, necessarily, argument) that the defendant's race or ethnicity makes it likely the defendant will engage in future criminal conduct. He maintains that, because the statute is written in mandatory terms and is designed to protect a defendant's right to equal protection, the right should be deemed both nonwaivable and nonforfeitable.

But "[t]o say that a statute is 'mandatory' is simply to say that the law prescribes the manner in which a particular action should or shall be taken." *Ex parte McCain*, 67 S.W.3d 204, 210 (Tex. Crim. App. 2002). While some mandatory statutes create category-two *Marin* rights, *see, e.g.*, *Proenza v. State*, 541 S.W.3d 786, 801 (Tex. Crim. App. 2017) (holding that claims of improper judicial commentary that violate Art. 38.05 are not subject to forfeiture by inaction), we have concluded that Art. 37.071, Sec. 2(a)(2), does not. *See Compton v. State*, 666 S.W.3d 685, 730 (Tex. Crim. App. 2023).

Art. 37.071 governs the punishment phase of capital murder trials. Subsection 2(a)(2) limits the type of evidence that the State may offer. While the provision implicates the constitutional right of equal protection, it governs the admissibility of evidence. *See Ex parte Carter*, 521 S.W.3d 344, 349 (Tex. Crim. App. 2017) (distinguishing between violations of constitutional rights and statutory or procedural violations, and stating that,

while "procedural errors or statutory violations may be reversible error," they "are not necessarily fundamental or constitutional errors"). Consequently, an alleged violation of Art. 37.071, Sec. 2(a)(2), must be raised at trial, and because Appellant failed to do so, he forfeited this claim.

Because Appellant failed to preserve these claims at trial, we cannot review them on this instant appeal. *See, e.g.*, *Brooks v. State*, 990 S.W.2d 278, 286 (Tex. Crim. App. 1999) (defendant's failure to object at trial forfeited appellate claim that testimony was admitted for sole purpose of appealing to potential racial prejudices of jury); *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007) (defendant must pursue adverse ruling on objection to jury argument to preserve error in prosecutorial argument); *Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012) (appellant forfeited due process claim by failing to object to prosecutorial misconduct at trial); *Mosley v. State*, 666 S.W.3d 670, 676 (Tex. Crim. App. 2023) (appellant did not properly preserve statutory violation complaint by failing to state ground with sufficient specificity at trial). Consequently, we overrule points of error five, six, and seven.

## Admission of Surveillance Video Footage

In point of error seventeen, Appellant argues that the trial court erred in admitting a recording of surveillance video footage because it had not been properly authenticated under Rule 901 of the Texas Rules of Evidence. Appellant contends that the State did not properly authenticate the surveillance video it recovered from a neighbor's security system. Because the trial court reasonably concluded that the State's evidence satisfied its burden of establishing a prima facie case of authenticity, we find no abuse of discretion in

admitting the evidence.

## Background

During the investigation of Zelaya's murder, officers canvassed the area between Appellant's residence on Burton Drive and his former residence on Truman Street looking for evidence. Officers recovered home surveillance footage from Appellant's neighbor whose property was approximately eight houses down from Appellant. During trial, the State offered the neighbor's surveillance video footage, as well as his testimony, to show that Appellant transported Zelaya's decapitated head. The neighbor testified that he had two security cameras mounted on the side of his house which were in operation during the timeframe of the offense. After an officer reviewed the footage from the neighbor's security cameras, detectives collected the video. The neighbor confirmed that the footage on the disk fairly and accurately depicted the street outside his driveway on the night of the offense at issue. The surveillance footage contained a timestamp which indicated that the recording was from September 2, 2017, at approximately 12:30 P.M. to 1:00 P.M.

On voir dire cross-examination, Appellant asked the neighbor how he knew that the footage from the video came from his surveillance equipment. The neighbor said he knew the footage came from his security system because it showed a part of his yard, his neighbor's house, and the intersection near his home. The neighbor conceded that he did not view the footage before the video was taken by detectives. Instead, he watched it at the Tarrant County District Attorney's Office after the footage had been downloaded onto a disc by law enforcement. The neighbor testified that the disc being offered into evidence was the same disk he reviewed at the district attorney's office. Appellant objected to the

admission of the video because it was not properly authenticated. The trial court overruled the objection and admitted the video.

The State published the video during Detective Gildon's testimony, who narrated the video while it played for the jury. During his narration, Gildon stated that Appellant was on a bicycle with a sign over his shoulder and a black trash bag with a heavy round object in it swinging from the handlebars. Gildon believed Appellant was the cyclist in the video because the cyclist passed the security cameras around the same time that Appellant told the detectives he took the sign and Zelaya's severed head to the Truman Street location.[17] Appellant did not object to Gildon's testimony about the surveillance video.

**Standard of Review**

We review a trial court's ruling on authentication for an abuse of discretion. *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). Under this deferential standard, if the trial court's ruling that a jury could reasonably find the proffered evidence to be authentic is at least within the zone of reasonable disagreement, an appellate court must uphold the court's admissibility decision. *Id.* Rule 901, which governs the authentication requirement for the admissibility of evidence, requires the proponent of an item of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a).

We have described the authentication requirement as a liberal standard of

_____

[17] We note that Appellant told the detectives that he had walked to the Truman Street location, not that he was riding a bicycle.

admissibility. *Fowler*, 544 S.W.3d at 849 (quoting *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015)). The proponent must only produce sufficient evidence that a reasonable fact finder could properly find genuineness. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Conclusive proof of authenticity before allowing admission of disputed evidence is not required. *Fowler*, 544 S.W.3d at 848. It is ultimately the jury's role to determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the evidence has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic. *Id.* at 848–49; *Butler*, 459 S.W.3d at 600.

Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence. *Tienda*, 358 S.W.3d at 638; *see Butler*, 459 S.W.3d at 602 (noting that authenticating evidence may be direct or circumstantial). Further, authenticity may be established with evidence of "distinctive characteristics and the like," including "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." TEX. R. EVID. 901(b)(4).

## Analysis

The State contends that because Appellant did not object to Gildon's testimony about the video footage, he failed to preserve his complaint for appellate review. The State notes that after the trial court overruled his authentication objection and admitted the video, Appellant did not object to Gildon's testimony about the surveillance video's contents, nor did he obtain a running objection or a ruling on his authentication complaint. Ordinarily,

to preserve a complaint about the erroneous admission of evidence, an objection must be made at the time the inadmissible evidence is offered unless the complaining party obtained a running objection or obtained a ruling on his complaint in a hearing outside the presence of the jury. *Lopez v. State*, 253 S.W.3d 680, 684 (Tex. Crim. App. 2008). However, the State's reliance on the general preservation rule here is misplaced. The error preservation rule does not apply when the unobjected-to evidence, which proves the same facts as the objected-to evidence, is not subject to the same objection as the objected-to evidence. *See Matz v. State*, 14 S.W.3d 746, 747 (Tex. Crim. App. 2000).

In *Matz v. State*, we held that the defendant did not forfeit his hearsay objection to the admission of the child complainant's videotaped interview by failing to object to the child's trial testimony. *Id.* We observed that the objection to the videotape went to its form, not its substance, and that the defendant could not be expected to raise a hearsay objection to the child's live trial testimony. *Id.* Similarly, Appellant did not object to the substance of the video, but to the authenticity of the video. His objection regarded whether the State had established that the video was in fact what it purported to be—the surveillance video footage from Appellant's neighbor's security cameras. On direct examination, Gildon narrated the video based on his observations of the video. There was no basis for Appellant to make an authentication objection to the detective's testimony. Thus, the failure to object to Gildon's testimony about what he believed the footage depicted did not forfeit Appellant's authentication objection.

Turning to the merits of Appellant's arguments, he asserts that his neighbor lacked sufficient knowledge of the video footage to testify to its accuracy or reliability for two

reasons. First, the neighbor did not witness the events depicted on the video, and therefore could not verify that the video accurately represented the scene on that date and time. Second, the neighbor failed to provide sufficient evidence that his surveillance system reliably created the video that was presented, that the system was functioning properly, and the footage reflected the correct date and time. Therefore, Appellant contends that the State failed to properly authenticate the surveillance video.

We have previously held that it is possible for a proponent of a video to sufficiently prove its authenticity without the testimony of someone who either witnessed what the video depicts or is familiar with the functioning of the recording device. *See Fowler*, 544 S.W.3d at 848–50. Video recordings without audio are treated as photographs and are properly authenticated when it can be proven that the images accurately represent the scene in question and are relevant to a disputed issue. *Id.* at 849; *see Huffman v. State*, 746 S.W.2d 212, 222 (Tex. Crim. App. 1988) (concluding that rules relating to admission of ordinary photographs applied to exhibit that was only visual portion of videotape). Thus, Appellant's neighbor didn't have to witness what the State alleged the video to show—that Appellant transported Zelaya's decapitated head. Because the surveillance video did not contain audio, the neighbor properly authenticated the video by accurately representing the scene in question—his yard and that which was nearby. The neighbor testified that he had not seen the footage before giving it to officers, but he knew the video came from his surveillance system because it contained views that were familiar to him. He stated that the video fairly and accurately depicted the street outside his driveway.

The State also presented circumstantial evidence that authenticated the surveillance

video.  The neighbor testified that detectives retrieved the surveillance video shortly after he noticed law enforcement canvasing the area near to his house.  Further, the date and time stamp on the surveillance video is corroborated by Appellant's statement regarding the date and time he transported Zelaya's decapitated head.  Finally, the video depicted a cyclist carrying a sign and trash bag containing an object similar in size and shape to a severed head during the timeframe that Appellant reported transporting the sign and head to the Truman Street location.

Based on the appearance, content, and substance of the surveillance video, when considered with the circumstances in which the video was recovered and the homeowner's testimony, the trial court reasonably concluded that the State satisfied its burden of presenting a prima facie case of authenticity. *See, e.g.*, *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007) (holding that authentication was proper because it contained sufficient distinctive internal characteristics to support a finding that it was what the proponent claimed it was).  Certainly, it was within the zone of reasonable disagreement for the trial court to conclude that a reasonable juror could find that the surveillance video was in fact the footage recorded by Appellant's neighbor's security system. *See Fowler*, 544 S.W.3d at 848.  Therefore, we conclude that the trial court did not abuse its discretion in admitting the surveillance video over Appellant's objection.  We overrule point of error seventeen.

### Jury Charge Error

In point of error four, Appellant challenges the trial court's Art. 38.22, Sec. 7, instructions in the jury charge.  Appellant's contention is that the trial court erred when it

instructed the jury that it could consider Appellant's statement made during interrogation, even if the jury found the detectives failed to adhere to the requirements of *Miranda* and Art. 38.22, if the statement contained true facts that established Appellant's guilt. Because the trial court erred in misstating the law in the jury charge, Appellant argues he was egregiously harmed.

## Background

During the guilt-innocence phase of Appellant's trial, the jury charge included an Art. 38.22, Sec. 7 instruction, but the charge also included additional instructions relating to Sec. 3(c). The Sec. 3(c) instructions were included in both the abstract paragraph and the application paragraphs of the Art. 38.22, Sec. 7 instructions. The relevant portion of the jury charge is as follows:

> You are instructed that before a statement of an accused made orally to law enforcement officers and made while in custody may be considered, it must be shown by legal evidence beyond a reasonable doubt that prior to making such oral statement that the accused has been warned by the person to whom the statement is made, or by a magistrate, that (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial, (2) that any statement he makes may be used as evidence against him in court, (3) that he has right to have a lawyer present to advise him prior to and during any questioning, (4) that if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning, and (5) that he has the right to terminate the interview at any time, and that the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights in the warnings as set out above. The use of substantially equivalent language constitutes adequate compliance with this requirement. *This rule does not apply to any statement that contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted property or the instrument with which he states the offense was committed.*
> So, in this case, [i]f you find beyond a reasonable doubt that the aforementioned warning was given, either verbatim or in substantially

equivalent language, to the defendant prior to his having made such statement, if he did make it, *or if you find that the defendant's statement, if any, contained assertions to facts or circumstances that were found to be true, if they were, and which conduced to establish the guilt of the accused, if they did, then you may consider the statement, if any, for all purposes.*

However, if you find from the evidence, or if you have a reasonable doubt thereof, that prior to the time the defendant gave the alleged statement to Grant Gildon or Michael Barakat, if he did give it, the said Grant Gildon or Michael Barakat did not warn, either verbatim or in substantially equivalent language, the defendant in the respects enumerated above, *or that the defendant's statement, if any, does not contain assertions to facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, then you will wholly disregard the alleged confession or statement and not consider it for any purpose nor any evidence obtained as a result thereof.*

(Emphasis added). When presented with the jury charge, Appellant asked the trial court to make two changes to the charge: one regarded the use of the term "substantially equivalent" in the voluntariness instruction and the second concerned corpus delicti. The trial court denied both of Appellant's requests. Neither Appellant nor the State objected to the inclusion of the Sec. 3(c) instructions in the jury charge.

## Standard of Review

In reviewing an alleged jury charge error, we determine whether error exists, and if so, we evaluate whether sufficient harm resulted from the error to require reversal. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022); *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). The degree of harm required for reversal depends on whether the jury charge error was brought to the trial court's attention. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g) (setting forth standards of appellate review for claim of jury charge error). If the alleged jury charge error has not been raised by an objection or request for an instruction, *see* Arts. 36.14, 36.15, reversal is required

only if the appellant suffered egregious harm. *Alcoser*, 663 S.W.3d at 165; *see Almanza*, 686 S.W.2d at 171.

Egregious harm exists if the error affects the very basis of the defendant's case, deprives him of a valuable right, or vitally affects a defensive theory. *Alcoser*, 663 S.W.3d at 165; *Ngo*, 175 S.W.3d at 750. A finding of egregious harm must be based on actual harm rather than theoretical harm. *Alcoser*, 663 S.W.3d at 165 (quoting *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)). Egregious harm is a difficult standard to meet, and the analysis is fact specific. *Alcoser*, 663 S.W.3d at 165; *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). We assess harm in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Alcoser*, 663 S.W.3d at 165 (quoting *Almanza*, 686 S.W.2d at 171).

Art. 38.22 dictates when a defendant's statements may be used at trial. When an issue is raised by the evidence, Sec. 7 requires that the trial judge appropriately instruct the jury on the law pertaining to that statement. *See* Art. 38.22, Sec. 7. Oral confessions are generally inadmissible unless there is compliance with the requirements of Art. 38.22, Sec. 3(a). *See* Art. 38.22, Sec. 3(e); *Woods v. State*, 152 S.W.3d 105, 116 (Tex. Crim. App. 2004). However, Sec. 3(c) sets forth an exception to non-compliance with Sec. 3(a) by allowing the admission of a non-compliant oral statement that contains "assertions of facts or circumstances that are found to be true," and "establish the guilt of the accused." Art. 38.22, Sec. 3(c).

**Analysis**

Appellant acknowledges and we agree that the Art. 38.22, Sec. 7 instructions were correctly given. However, we have previously held that the Sec. 3(c) exception is a question of law, not of fact, that should not be submitted to the jury. *Moon v. State*, 607 S.W.2d 568, 572 (Tex. Crim. App. 1980) ("Likewise, we determine that Article 38.22, Sec. 3(c) deals only with the legal issue of the admissibility of the oral statement, which is a question of law to be determined by the trial court.").

Both parties acknowledge, the trial court erred by adding the Sec. 3(c) exception instructions to the Art. 38.22, Sec. 7, instructions.[18] However, given the state of the evidence, and our conclusion that the warnings given to Appellant complied with the requirements of *Miranda* and Art. 38.22, we conclude that Appellant did not suffer egregious harm due to the trial court's erroneous inclusion of the Sec. 3(c) instructions in the jury charge. It does not matter if the statutory exception under Sec. 3(c) applied to Appellant's statements because, as discussed above, the record demonstrates that the *Miranda* and Art. 38.22 requirements were met. We overrule point of error four.

### Improper Jury Argument

In four points of error, Appellant challenges the State's jury argument. More specifically, Appellant asserts that the prosecutor improperly argued outside the record during the guilt phase (point of error nine), commented on his right to remain silent (points of error fifteen and sixteen), and bolstered the credibility of the State's punishment witnesses (point of error eight).

_____

[18] The State concedes that the trial court erred in giving the additional Sec. 3(c) instructions.

### *Outside the Record*

In point of error nine, Appellant contends that the trial court erred in overruling his objections to the State's argument being outside of the record during its guilt phase closing argument. Specifically, Appellant argues that the State's comment that it could have easily contradicted Appellant's witness' testimony with witnesses it chose not to call was an improper argument because it introduced facts outside the record. Thus, Appellant argues the trial court's ruling had a substantial and injurious effect on Appellant's conviction.

### Background

As mentioned above, Appellant presented the expert testimony of Terri Moore, a longtime criminal defense attorney. Moore opined that the warnings provided by Detective Barakat did not substantially comply with *Miranda* or Art. 38.22. Because the warnings did not comply with the constitutional and statutory requirements, Moore believed Appellant's waiver was ineffective which rendered his statements involuntary. During her testimony, the prosecutor had Moore read highlighted portions of this Court's opinion in *Darden v. State*, as well as highlighted portions from *Bustinza v. State*, an unpublished opinion from the Corpus Christi–Edinburg Court of Appeals. 629 S.W.2d 46 (Tex. Crim. App. 1982); No. 13-11-00314-CR, 2012 WL 3755530 (Tex. App.—Corpus Christi–Edinburg Aug. 29, 2012, no pet.). According to the State, these two cases contradicted Moore's testimony that Appellant's waiver was not valid because the warnings he received were inadequate.

In its closing argument, the State argued that the warnings Appellant received were sufficient:

One, the use of substantially equivalent language constitutes adequate compliance with this rule, meaning the rule that says the warnings have to be given.

Substantially equivalent language, and it was done here. All right. Now, yes, they brought in a criminal defense attorney to take the stand and say, well, it didn't sound good enough to me.

Now, I submit to you, ladies and gentlemen, that the only difference between Terri Moore and [Appellant's defense attorneys] is that Terri Moore sat in this chair instead of at that table over there. Okay. She was acting as a member, a fully functioning member of the criminal defense team in this case.

I'm sure that I -- and I'm sure you will agree, *I could have brought five or six or ten prosecutors in here to disagree with Ms. Moore, to say, well, sounded okay to me. . .*

But see, that wouldn't be appropriate. It's not right to do that. *But if I had done that and they had said exactly what I just said, the difference between their testimony and Ms. Moore's would be that their testimony would be in accordance with the law.* Their testimony . . .

Their testimony would be guided by the opinion that was cited, that was authored by the Court of Criminal Appeals, the highest criminal court in this state, on par, on a level with the Supreme Court of this state. The Supreme Court does civil cases, Court of Criminal Appeals does criminal cases. That's the law. That's not in dispute. But Ms. Moore said she didn't like it.

She didn't think it was right. She doesn't get to pick and choose what the law is. The law is the law. And the law is right here. And the statement is fine. And you can consider it for all purposes. (Emphasis added).

## Standard of Review

Generally, the bounds of proper closing argument are left to the sound discretion of the trial court. *Milton v. State*, 572 S.W.3d 234, 240 (Tex. Crim. App. 2019). Thus, we review a trial court's ruling on an objection to jury argument for an abuse of discretion. *Id* at 241. Proper jury argument generally falls within one of four areas: (1) summation of the

evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Id.* at 239. The focus of argument must encourage the jury to decide the case on the evidence in front of it rather than information outside the record. *Id.* at 240. Therefore, reference to facts not in evidence, nor inferable from the evidence, is improper. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008); *see Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011) ("A prosecutor may not use closing arguments to present evidence that is outside the record.").

## Analysis

Assuming, without deciding, that the State's argument in this regard was improper, we conclude that any error was harmless, as it did not affect Appellant's substantial rights. *See* Tex. R. App. P. 44.2(b); *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000) (applying non-constitutional standard for determining harm in improper argument cases). In considering harm flowing from an improper jury argument, we consider the severity of the misconduct, curative measures, and the certainty of conviction absent the misconduct. *Id*. at 693. Here, these factors weigh in favor of finding that any error was harmless.

First, the State's argument could be fairly characterized as an analogy; the presentation of an expert defense attorney witness who opined that the warnings given to Appellant were insufficient could easily be confronted with the presentation of an expert prosecutor witness who would opine the exact opposite to be true. Thus, the argument is more akin to a comment on Moore's credibility as an expert than an attempt to focus the jury's attention on facts outside the record. The State's argument could also be seen as pointing out Moore's potential for bias in favor of Appellant due to her work as a criminal

defense attorney. Second, the case law referenced by the prosecutor was the subject of a line of questioning with Moore during her testimony. As to curative measures, the jury was instructed that arguments made by the parties in closing were not evidence of Appellant's guilt. Finally, as discussed in greater detail in other sections of this opinion, the record supports the certainty of Appellant's conviction absent any alleged improper jury argument. Accordingly, we overrule point of error nine.

### *Improper Comment on Failure to Testify*

In points of error fifteen and sixteen, Appellant argues that the prosecutor made an improper comment on Appellant's right to remain silent during the State's closing argument in violation of the Fifth Amendment (point of error fifteen) and Art. 38.08 (point of error sixteen). Appellant contends that the State's comments on what Appellant must have known and what exculpatory testimony he must have been unable to provide constituted an impermissible reference to Appellant's constitutional and statutory right to remain silent.

### Background

During the guilt phase of Appellant's trial, the State presented evidence from Eustorgio Salas, IV, who testified that two days after the bodies of Zelaya and Chirinos were discovered, he purchased a gun from his friend; Appellant was present during this transaction. According to Salas, Appellant demonstrated how to load the gun. Two days after buying the gun, Salas saw news reports connecting Appellant to the murders of Zelaya and Chirinos. Because he was concerned that the gun he purchased may have been used in the murders, Salas turned the gun in to law enforcement. Subsequent ballistics testing

revealed that the gun Salas purchased was the same gun that fired the casings found in the trash bags at Appellant's house, as well as the bullets recovered from the bodies of Zelaya and Chirinos.

During its closing argument, the State discussed the recovered murder weapon. Specifically, the prosecutor argued the following:

> The .22 revolver is the murder weapon. [Law enforcement] had the murder weapon. They recovered it from Mr. Salas. But they didn't know for sure that it was the murder weapon until a couple of things were done.
>
> First, the bullets were removed from the autopsy. And during the autopsy, they were submitted to ballistics analysis and they proved to be -- to have come from that gun. *But the defendant knew that was the murder weapon.*

(Emphasis added). Appellant objected to the State's comment as a comment on his failure to testify. The trial court overruled the objection. The prosecutor later made a similar argument concerning the machete:

> [Erick Zelaya's] head and his body bore obvious sharp cutting wounds. So yes, [law enforcement] suspected that they might have the weapon, but they didn't know they had the weapon until DNA analysis proved that it was, in fact, the weapon because Erick Zelaya's blood was found on the blade of that machete.
>
> They didn't know for sure until DNA. *But the defendant knew.*

(Emphasis added). Appellant did not object to this argument.

**Standard of Review**

Under the Fifth Amendment of the United States Constitution, "[n]o person … shall be compelled in any criminal case to be a witness against himself". U.S. CONST. amend. V. Texas also recognizes this right in its Constitution and under Art. 38.08. *See* Tex. Const. art. I, § 10 ("He shall not be compelled to give evidence against himself[.]"); Art. 38.08

(failure of defendant to testify "shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause"). Thus, a comment on a defendant's failure to testify violates both the federal and state Constitutions as well as Texas statutory law. *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011); *see Griffin v. California*, 380 U.S. 609, 615 (1965).

However, the implication that the State's comment referred to the defendant's failure to testify must be a clear and necessary one. *Randolph*, 353 S.W.3d at 891. Indirect or implied allusions, or language that might be construed as such, do not suffice to show a violation. *Id.*; *Patrick v. State*, 906 S.W.2d 481, 490–91 (Tex. Crim. App. 1995). The test is whether the language used was manifestly intended to be or was of such a character that the jury would necessarily and naturally take it as, a comment on the defendant's failure to testify. *Randolph*, 353 S.W.3d at 891; *see Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001) (collecting cases). Therefore, we must analyze the context in which the comment was made to determine whether the language used was of such character. *Randolph*, 353 S.W.3d at 891; *Bustamante*, 48 S.W.3d at 765. We must also view the State's argument from the jury's standpoint and resolve any ambiguities in the language in favor of its being a permissible argument. *Randolph*, 353 S.W.3d at 891. If some other explanation for the prosecutor's remark is equally plausible, we cannot find that the prosecutor manifestly intended to comment on the defendant's failure to testify. *Id.*

## Analysis

Appellant contends that the prosecutor's comment was improper because only Appellant can testify to his knowledge. *See Owen v. State*, 656 S.W.2d 458, 459 (Tex.

Crim. App. 1983) (explaining that conviction must be reversed if prosecutor's remark called jury's attention to absence of evidence that only defendant's testimony could supply). However, we do not find that the prosecutor's comment was an attempt to draw the jury's attention to evidence that could only come from Appellant. The inference that Appellant asks us to draw here is tenuous given the context of the statement.

During that portion of its jury argument, the State was referring to Appellant's interview with the detectives and reminding the jury of the facts that Appellant revealed during that interview that were later corroborated by other evidence. When placed in that context, the prosecutor's comment can reasonably be construed as referring to statements made by Appellant during his interview with detectives. *See, e.g.*, *Lopez v. State*, 339 S.W.2d 906, 910–11 (Tex. Crim. App. App. 1960) (holding that reference to defendant "not telling everything" where prosecutor was discussing defendant's written statement was not comment on failure to testify but reference to written statement); *see also Cruz v. State*, 225 S.W.3d 546, 548–50 (Tex. Crim. App. 2007) (concluding that it was clear from the record that prosecutor's statements to jury referred to defendant's own written statement, which had been admitted into evidence, and therefore were not comment on defendant's failure to testify); *Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004) (State's references to defendant's statement in evidence and comparison between statement and other evidence is not comment on defendant's failure to testify or right to remain silent).

Nothing in the record suggests that the prosecutor manifestly intended the remark to be a comment on Appellant's failure to testify at trial. The jury would not have naturally

and necessarily understood the prosecutor's comment to refer to Appellant's failure to testify at trial. Considering the context in which it was made, the prosecutor's comment could have been reasonably construed as a reference to statements Appellant made during his interview with detectives. Because there is an equally plausible explanation for the prosecutor's comment, there is no constitutional or statutory violation of Appellant's privilege against self-incrimination. *See Randolph*, 353 S.2.3d at 491. Therefore, we conclude that the trial court did not abuse its discretion by overruling Appellant's objection to the prosecutor's comment. We overrule points of error fifteen and sixteen.

### *Bolstering Comment*

In point of error eight, Appellant asserts that the prosecutor's remark, "truth sells," was improper. Specifically, Appellant argues that the comment violated his substantial rights because it bolstered the credibility of the State's witnesses and the overall credibility of the prosecution's theory that Appellant would be a future danger.

### Background

During Appellant's closing argument at punishment, his counsel commented on past experiences with the prosecutor. Appellant's counsel stated the following:

> Now, [prosecutor] and I have tried a few cases together. He's a very good lawyer. He'll give what I consider to be an outstanding argument. It will be the best one you probably ever hear in your life. I'm not looking forward to it.

In response, the prosecutor stated the following during the State's closing argument:

> I'd like to thank [defense counsel] for the very kind words that he had to say about me. It's true, we have tried a lot of cases together. I do not, however - - I don't take his words as meaning very much, not that they weren't kind words, but the things he said about me have nothing to do with me. *If it looks*

*like I have to him made good closing arguments in the past, it's because truth sells*. I have a lot to work with. (Emphasis added).

The prosecutor then continued with his closing argument with no objection from Appellant.

**Standard of Review**

As previously noted, the right to a trial untainted by improper jury argument is forfeitable. *Hernandez*, 538 S.W.3d at 622; *Cockrell*, 933 S.W.2d at 89. A defendant forfeits his right to complain on appeal about improper prosecutorial jury argument if he fails to object to the argument and pursue his objection to an adverse ruling. *See Archie*, 221 S.W.3d at 699. Appellant acknowledges that he did not object to the "truth sells" remark during the State's closing argument. He further acknowledges this Court's precedent requiring an objection to avoid forfeiting an appellate complaint about improper jury argument. However, Appellant contends that due to the significant role the prosecutor plays in the courtroom, remarks made by a prosecutor carry a great deal of influence on the jury. Thus, he argues that reversal is required, even absent an objection.

To support this argument, Appellant relies on this Court's opinion in *Blue v. State*. *See* 41 S.W.3d 129 (Tex. Crim. App. 2000) (holding trial court's comments to jury were fundamental error of constitutional dimension that did not require objection to preserve error). However, *Blue* concerned improper judicial comments to which the defendant did not object. As we later explained in *Proenza v. State*, that the right at issue in *Blue*—the right to be tried in a proceeding devoid of improper judicial commentary—is at least a category-two, waiver-only right. 541 S.W.3d 786, 797–801 (Tex. Crim. App. 2017). The alleged error here involves a prosecutorial comment, not a judicial comment.

Nonetheless, Appellant contends that an improper prosecutorial jury argument is comparable to a fundamental error consistent with the federal plain error standard. *See, e.g., United States v. Gracia*, 522 F.3d 597 (5th Cir. 2008). The traditional term in Texas criminal law that corresponds to plain error is fundamental error. *Jimenez v. State*, 32 S.W.3d 233, 238 (Tex. Crim. App. 2000). We have previously rejected the idea that fundamental error, as a freestanding doctrine of error preservation, exists independently from *Marin*'s categorized approach. *Proenza*, 541 S.W.3d at 793. Instead, we consider questions of fundamental error under the framework set forth in *Marin*. *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004); *see Proenza*, 541 S.W.3d at 794 (recognizing *Marin*'s subsumption of any fundamental error doctrine when re-iterating that questions of fundamental error now are considered in *Marin*'s framework). We have considered error relating to improper jury argument under the *Marin* framework and concluded that it concerns a forfeitable right. *See Hernandez*, 538 S.W.3d at 622; *Cockrell*, 933 S.W.2d at 89.

Moreover, we have previously declined to hold that error preservation was not required to raise an improper jury argument complaint on direct appeal. *See Hernandez*, 538 S.W.3d at 623. Appellant does not cite to any change in circumstances or a law that would prompt us to revisit our categorization of the right. Nor does his argument referencing the federal plain error standard prompt us to overrule our precedent. Therefore, we conclude that an improper prosecutorial jury argument must be preserved by an objection followed by an adverse ruling; otherwise, the defendant forfeits the complaint about such argument on appeal. *See Hernandez*, 538 S.W.3d at 623 ("Even incurably

improper jury argument is forfeitable."). Because Appellant did not object to the prosecutor's "truth sells" comment at trial, he forfeited his complaint about it on appeal. We overrule point of error eight.

## Conclusion

Finding no reversible error, we affirm the trial court's judgment of conviction and sentence of death.

Delivered: June 5, 2024

Do Not Publish